Kenny ROSENBALM; Will Ed Kirk; Viola Hurst; Sylvia Williams; Larry Wilson; and William Mason, Appellants,

v.

COMMERCIAL BANK OF MIDDLESBORO; Bell County Garbage and Refuse Disposal District; Blakeman & Sons, Inc.; City of Middlesboro; City of Pineville; Joan Asher Cawood, Bell County Court Clerk; and Bell County Fiscal Court, Appellees.

COMMERCIAL BANK OF MIDDLESBORO, Cross–Appellant,

v.

Kenny ROSENBALM; Will Ed Kirk; Viola Hurst; Sylvia Williams; Larry Wilson; William Mason; and W. Henry Graddy IV, Cross–Appellees.

Nos. 90–CA–002546–MR, 90–CA–002652–MR.

Court of Appeals of Kentucky.

May 29, 1992.

Discretionary Review Denied by Supreme Court Nov. 11, 1992.

W. Henry Graddy IV, Todd Evan Leatherman, Reeves & Graddy, Versailles, for appellants.

William A. Watson, Middlesboro, for Commercial Bank of Middlesboro.

Frank A. Atkins, Scoville, Cessna, Crawford & Atkins, London, for Bell County Garbage and Refuse Disposal Dist.

Lloyd R. Edens, Cline & Edens, Middlesboro, for Blakeman & Sons, Inc.

Charles E. Sigmon, Jr., Middlesboro, for City of Middlesboro.

Stephen C. Cawood, Barbourville, for City of Pineville.

Lowell W. Lundy, Pineville, for Joan Asher Cawood, Bell County Court Clerk.

Before GUDGEL, HUDDLESTON and McDONALD, JJ.

HUDDLESTON, Judge.

Appellants, taxpayers of Bell County, appeal from an order and judgment rendered by Bell Circuit Court dismissing, for lack of timeliness, their motion to intervene in a long-pending lawsuit which has ultimately resulted in the imposition of a tax on the County's citizens to pay the debts of the

Bell County Garbage and Refuse Disposal District. Because we determine that the record will not support this ruling, we reverse.

The Commercial Bank of Middlesboro cross-appeals from the denial of its motion for sanctions. Because we believe that the record supports the view that sanctions are inappropriate in the matter before us, we affirm on this issue.

This case features a lengthy factual and procedural history. The pertinent facts are as follows: The Bell County Garbage and Refuse Disposal District was created by Bell County Fiscal Court in 1971. During the 1970's the District enjoyed substantial federal assistance to underwrite its cost of operation. This assistance was provided in order that the District might quickly become a self-sustaining entity. Lamentably, self-sustenance was slow in coming, and as federal funding became non-existent in the twilight of the 1970's, the District found itself in dire financial straits. At this point the District's Board of Commissioners determined to embark upon a "Resource Recovery Project" utilizing a grant from the Environmental Protection Agency. The Project involved the building of a waste-to-energy incinerator, which would produce electricity that could then be sold to provide revenue to operate the District. One William Yeary was retained to administer the Recovery Project. The District's financial problems notwithstanding, Mr. Yeary set about to modernize its operations, incurring approximately $400,000.00 in debt by way of loans from the Commercial Bank of Middlesboro (hereinafter "Bank") from May, 1980, through August, 1982. Although the District and the Recovery Project were ostensibly to be operated as separate entities, the distinction between the two quickly became blurred, evidenced notably by the fact that the Project was allowed by the Bank to borrow on the District's credit.

Mr. Yeary and the District's board members may have intended to use the income anticipated to be generated by the Recovery Project to satisfy the District's debts.

Whatever the case, by 1982 the District had become wholly unable to meet its operating obligations. On September 14, 1982, Blakeman and Sons, Inc., an appellee in this action, sued the District on a fuel account, seeking judgment for $10,984.70. After obtaining judgment by default and issuing execution, Blakeman learned that the Bank held liens upon most District Property. Blakeman amended its complaint to join the Bank as a party defendant. The Bank immediately cross-claimed against the District and Bell County seeking satisfaction on notes issued in 1980 through 1982.

By early 1983 the Board had totally defaulted in its management of the District, resulting in all District services being terminated. In July, 1983, Bell Circuit Court issued a "declaratory judgment" in the District litigation. This judgment, advisory in tone, essentially detailed the court's opinion as to the manner in which the parties ought to resolve their disputes. The court did, however, conclude that the county was not liable for the District's debts, that the District should activate itself again or dissolve, and that the District was not responsible for proceeds of loans which had been recklessly spent or wasted by Mr. Yeary. (The court was particularly scathing in its assessment of Mr. Yeary's character and administrative skills.) The Bank appealed this declaratory judgment, but the appeal was dismissed by agreement of the parties as being premature in view of the fact that the court had not disposed of all issues before it.

The District's "orphan status" continued throughout 1983 and into 1984, its Board having "fled for the hills," its operations ceased. In June, 1984, a receiver was appointed for the District on the Bank's motion. The Bank then renewed its motion for summary judgment against the District, to which the District filed no affirmative response. The receiver advised the court that, "in his judgment,"[1] no defense existed against the Bank's claim. The court agreed in a summary fashion and on

---

1. The receiver's May, 1990, affidavit recounts that in 1984 he considered the possibility that Ky. Const. § 157 (see below) could be raised as

a defense to the Bank's claim, but determined that it would not be a viable defense.

October 11, 1984, granted a default judgment in the Bank's favor.

The record details in predictably haphazard fashion the on-going dialogue in Bell County concerning the manner in which the District might satisfy its debts. One option appears to have been consistently and categorically rejected by the county leaders, often in the most strident and bellicose terms: the imposition of a tax. The 1983 declaratory judgment mentions the tax option in an advisory fashion, but it orders no tax levy and no steps toward such end were undertaken by the county. The 1984 default judgment avoids mentioning the tax issue entirely. With a newly-appointed board, the District investigated in late 1984 and early 1985 the possibility of implementing a new garbage collection system which could fund a debt repayment plan. When this option proved untenable, the District sought bankruptcy protection without, evidently, even considering utilizing the taxing power to fund debt repayment.

The District filed a Chapter 9 bankruptcy petition in the United States Bankruptcy Court for the Eastern District of Kentucky in the summer of 1985. The case was held in abeyance for over three years until the bankruptcy court ruled, in February, 1989, that the District's petition would be rejected on the ground that it possessed the taxing authority to satisfy its debts—an authority, again, whose utilization the District continued to vehemently reject.

On the Bank's motion the case was re-docketed in Bell Circuit Court in March, 1989. On June 5, 1989, the circuit court ordered the county to satisfy the Bank's 1984 default judgment through a tax levy, bond issue, or some combination of the two. During the remainder of the year the county went to extraordinary lengths to resist the imposition of the tax, resulting in the Bank seeking to have District and County executives held in contempt. On November 29, 1989, the circuit court ordered that county officials cease all efforts to resist the imposition of the tax and proceed to collect it, under penalty of contempt. At this point the county relented, and the tax was placed on the county's 1989 tax bills. Taxpayers received notice of the tax levy in December, 1989.

On February 27, 1990, six Bell County taxpayers, the appellants, attempted to intervene as of right in the case under consideration pursuant to CR 24.01. The taxpayers contended, *inter alia,* that the debt accumulated by the District between 1980 and 1982, violated the "pay as you go" plan of public financing memorialized in Section 157 of the Kentucky Constitution.[2] The taxpayers further sought a declaration of rights pursuant to Chapter 418 of the Kentucky Revised Statutes.[3] The circuit court ordered all issues briefed. On April 3, 1990, the Bank moved for sanctions against the taxpayers, contending that their intervention was being pursued in bad faith.

2. Ky. Const. § 157 provides, in pertinent part: " * * * No county, city, town, taxing district, or other municipality, shall be authorized or permitted to become indebted, in any manner or for any purpose, to an amount exceeding, in any year, the income and revenue provided for such year, without the assent of two-thirds of the voters thereof, voting at an election to be held for that purpose; and any indebtedness contracted in violation of this section shall be void. Nor shall such contract be enforceable by the person with whom made; nor shall such municipality ever be authorized to assume the same."

3. KRS 418.040 provides: **Plaintiff may obtain declaration of rights if actual controversy exits.** "In any action in a court of record of this commonwealth having general jurisdiction wherein it is made to appear that an actual controversy exists, the plaintiff may ask for a declaration of rights, either alone or with other relief; and the court may make a binding decla-

ration of rights, whether or not consequential relief is or could be asked."

KRS 418.045 provides: **Persons who may obtain declaration of rights—Enumeration not exclusive.** "Any person interested under a deed, will or other instrument of writing, or in a contract, written or parol; or whose rights are affected by statute, municipal ordinance, or other government regulation; or who is concerned with any title to property, office, status or relation; or who as fiduciary, or beneficiary is interested in any estate, provided always that an actual controversy exists with respect thereto, may apply for and secure a declaration of his right or duties, even though no consequential or other relief be asked. The enumeration herein contained does not exclude other instances wherein a declaratory judgment may be prayed and granted under KRS 418.040, whether such other instance be of a similar or different character to those so enumerated."

The Bank also sought dismissal of the taxpayers' intervening petition. On April 23, 1990, the taxpayers moved for summary judgment, then, in June, moved to certify their cause as a class action under CR 23.01.

Oral argument regarding all issues was heard on August 28, 1990. On September 13, 1990, the taxpayers moved to amend their complaint "to conform to oral argument." At the same time, the taxpayers withdrew their motion for summary judgment against Blakeman & Sons, and restated their motion for summary judgment against the Bank. On September 14, 1990, the court overruled the taxpayers' motion for summary judgment, granted the Bank's motion to dismiss the intervening complaint with prejudice, and overruled the Bank's motion for sanctions. In doing so, the court said:

> It appears from the record the intervenors' [taxpayers'] interests were represented by [the receiver] for the district. The intervenors were aware of the litigation. This action was the subject of extensive publicity by the local newspaper. Many articles, usually on the front page, were written in detail about this litigation. The intervenors had every opportunity to join in this litigation years ago and chose not to do so. The attempt to join now is not timely, and is unfairly prejudicial to the other litigants.

The taxpayers moved for reconsideration and made various other motions. By final order and judgment, on November 7, 1990, the circuit court overruled the taxpayers' motion to certify a class, their motion to file a second petition for a declaration of rights, and their motion to set aside the 1984 default judgment against the District. It also overruled the Bank's renewed motion for sanctions. It is from this final judgment that the taxpayers and the Bank seek review in this Court.

■ The taxpayers attempted to intervene in this case pursuant to CR 24.01, entitled "Intervention of right." The rule provides, in pertinent part:

> Upon timely application anyone shall be permitted to intervene in an action . . .

(b) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by exiting parties.

An attempted intervention clearly must be undertaken in a timely fashion. The timeliness of a motion for intervention is a question of fact, the determination of which ordinarily falls to the presiding judge. *Ambassador College v. Combs*, Ky.App., 636 S.W.2d 305, 307 (1982). An applicant who moves for intervention after judgment carries a special burden of justifying the apparent lack of timeliness. *Monticello Elec. Plant Bd. v. Board of Educ.*, Ky., 310 S.W.2d 272, 274 (1958).

■ The elements of a taxpayer action may generally be defined as:

> (1) a wrongful act on the part of a public body or its officers, (2) injury to the complaining taxpayer or to the public body, and (3) a right to seek the relief prayed for.

74 Am.Jur.2d *Taxpayers' Actions* § 2 (1974) at 185. Taxpayers' actions are viewed generally as being equitable in nature, and have traditionally been governed to a large extent by equitable principles. *Id.* This state has long recognized that a valid taxpayers' action may be properly maintained. *Breathitt County v. Cockrell*, 250 Ky. 743, 63 S.W.2d 920, 923 (1933); *Commonwealth, to Use of Wiggins v. Scott*, 112 Ky. 252, 65 S.W. 596, 598–599 (1901).

■ Here, the taxpayers sought, *inter alia,* a declaration of rights. A declaratory judgment action proceeds under KRS 418.-040,[4] and

> . . . may be brought to declare rights under a municipal ordinance only where the rights of the plaintiff are affected by the ordinance and an actual controversy exists. . . . An "actual controversy" is not one which involves a question which is academic or hypothetical or which calls for nothing more than an advisory opin-

4. See Note 3.

ion.... Rather, it is a controversy over present rights, duties, and liabilities.

*Bischoff v. City of Newport,* Ky.App., 733 S.W.2d 762, 763–764 (1987). The earlier case of *Dravo v. Liberty Nat'l Bank & Trust Co.,* Ky., 267 S.W.2d 95, 97 (1954) observes that a declaratory judgment should not address merely a "present controversy," but a "justiciable controversy." "Justiciability" in the context of a taxpayers' action has generally necessitated that taxpayers possess a pecuniary interest in the subject matter of their action. *Cooper v. Kentuckian Citizen,* Ky., 258 S.W.2d 695, 696 (1953); and see *Doremus v. Board of Education,* 342 U.S. 429, 433–435, 72 S.Ct. 394, 397–398, 96 L.Ed. 475, 479–480 (1952). It is generally true, however, that such damage or injury may be presumed when a public contract or similar public act is undertaken in violation of statute. *Cooper* at 696.

■ The taxpayers argue that during a 27–month period in 1980–1982, the District "received $408,769.64 in loans that the District had no ability to pay out of general revenues within the fiscal year incurred," and, consequently, that such debt violates the "pay as you go" plan of public financing established in Ky. Const. § 157. Since there is no indication in the record that a tax was contemplated as a viable method of financing the District's debt repayment prior to the circuit court's June 5, 1989, order—indeed, there is every indication that the tax option was consistently and vehemently rejected—it is arguably the case that the pecuniary interest of the taxpayers was not sufficiently jeopardized until that time, so that an attempted intervention on their part prior to that date would have been premature.

The taxpayers, however, necessarily argue that the levied 1989 tax is unconstitutional, precisely because it is being used to fund the unconstitutional *debt* of 1980–1982. This being the case, under general principles of taxpayer relief, the litigation which began in 1982, resulting in the appointment of a receiver in 1984, could technically be deemed sufficient to have put the

taxpayers of Bell County "on notice" that the issue of unconstitutional public indebtedness was afoot in their county. In this formal context, the failure of the taxpayers to intervene prior to the October 11, 1984, default judgment could be seen to result in the taxpayers losing any opportunity for a timely subsequent intervention.[5] This Court, however, is fully cognizant of the equitable nature of taxpayer actions. We therefore refuse to embrace such hypertechnical, formalistic conclusions.

In finding the taxpayers' attempted intervention untimely, the circuit court judgment inevitably raised the issue of laches. The laches doctrine essentially provides that:

> neglect or omission to assert one's rights within a reasonable period of time, where it causes prejudice, injury, disadvantage or a change of position to the other party, will bar enforcement of that claimant's rights.

*Wigginton v. Commonwealth ex rel. Caldwell,* Ky.App., 760 S.W.2d 885, 887 (1988). In the context of taxpayers' actions,

> ... even though the governing authorities of a city, town, county, or other public body may be proceeding in a matter affecting taxpayers without warrant of law, so as to justify the interference of the court on the application of a taxpayer, the remedy of taxpayers may be lost by laches on their part in applying for relief.

74 Am.Jur.2d *Taxpayers' Actions* § 37 (1974) at 245–246. However, the "degree of laches necessary to make it inequitable to enforce the plaintiff's action must be determined according to the facts of each particular case." *Wigginton* at 887. Furthermore, the laches doctrine has traditionally not been applied against a taxpayer who undertakes an action on behalf of a public body or other taxpayers to the same extent that it is applied to an individual plaintiff. Courts have observed that the passing of time does not diminish the illegality of an impermissible public act, and

---

5. Since the Bank insists that the October 11, 1984, default judgment is *res judicata* regarding all issues in this litigation, it inferentially concedes that an attempted intervention by the taxpayers on October 12, 1984, or subsequently, would have been precluded.

that other taxpayers or the taxing unit should not suffer due to the laches of plaintiff taxpayers. *Thornton v. Village of Ridgewood,* 17 N.J. 499, 511, 111 A.2d 899, 905 (1955); *Harfst v. Hoegen,* 349 Mo. 808, 817, 163 S.W.2d 609, 614 (1942).

 We are not prepared to deny the taxpayers of Bell County an opportunity to legally redress a situation directly impacting their pecuniary interest simply because they lacked the lawyerly acumen to recognize the possibility of advancing a sophisticated constitutional argument at a time when their pecuniary interest was by all appearances *not* in jeopardy. The record is undisputed that the taxpayers moved with speed to secure counsel and seek intervention in this case after the Bell County tax was levied—the tax was levied in December, 1989; the taxpayers moved for intervention in February, 1990. Accordingly, we reverse the order/judgment denying the taxpayers the right to intervene in this case. We further hold, in accord with *Bischoff v. City of Newport,* Ky.App., 733 S.W.2d 762, 763 (1987), that "[a] class action is an appropriate vehicle for a declaratory judgment as to the validity of a tax assessment or rate," and order the certification of a class action by the circuit court according to CR 23.

 The Bank contends that the default judgment it obtained on October 11, 1984, is *res judicata* regarding all issues which "were litigated, *or which might have been litigated.*" (Bank's emphasis.) The record reveals that the District was in receivership at the time the default judgment was issued; the District's directors had resigned, resulting in no answer being filed by the District; the court-appointed receiver advised the court that, "in his judgment," no defense existed against the Bank's claims, which "judgment" the court embraced as a finding. In this circumstance, a default judgment issued as a matter of course.

The *res judicata* doctrine may be summarized as follows:

[A] final judgment rendered upon the merits ... by a court of competent jurisdiction, is conclusive of causes of action and of facts or issues thereby litigated, as to the parties and their privies, in all other actions in the same or any other judicial tribunal of concurrent jurisdiction.

46 Am.Jur.2d *Judgments* § 394 (1969) at 558–559. Collateral estoppel, a subdivision of the *res judicata* doctrine, precludes the relitigation of issues from a prior adjudication. *Revenue Cabinet v. Samani,* Ky. App., 757 S.W.2d 199, 201 (1988). Each of the elements mentioned in the definition above must be demonstrated if *res judicata* is to be successfully invoked, "including the existence of a final judgment rendered upon the merits, an identity of the subject matter, and an identity of the parties." *BTC Leasing, Inc. v. Martin,* Ky.App., 685 S.W.2d 191, 197 (1984).

 The District's receiver refused to defend against the Bank's motion for default judgment. The receiver opined that no defenses existed, a fact repeatedly emphasized by the Bank. The circuit court order dismissing the taxpayers' complaint notes that "it appears from the record the intervenors' interests were represented by [the receiver]." Through this ruling the court defeats the CR 24.01 intervention, and at least raises the *res judicata* issue. However, the Supreme Court and this Court have consistently made it clear that a receiver is in *no sense* a representative of any party involved in a litigation; a receiver represents the appointing court, and only the court. *Rapp Lumber Co. v. Smith,* 243 Ky. 317, 48 S.W.2d 17, 19 (1932); *Crump & Field v. First Nat'l Bank of Pikeville,* 229 Ky. 526, 17 S.W.2d 436, 439 (1929); *Moren v. Ohio Valley Fire & Marine Ins. Co.'s Receiver,* 224 Ky. 643, 6 S.W.2d 1091, 1093 (1928); *Cerwin v. Taub,* Ky.App., 552 S.W.2d 675, 678 (1977). Accordingly, we decline to accept the Bank's contention that the defenses rejected by a receiver in the context of a default judgment should preclude the privy of a defaulting party from later raising such defense. We hold, for CR 24.01 purposes, that the taxpayers' interests were not adequately represented in 1984 by "existing parties." Our decision is supported by 56 Am.Jr.2d *Municipal Corporations* § 873 (1971) at 852:

[Municipal] officers cannot, by their refusal to act or to defend, give conclusive validity to their own unlawful acts or accomplish purposes which they are without power to accomplish by direct action. When it is sought to bind a governmental body or its citizens or taxpayers by a judgment rendered against it by default or consent or which it otherwise failed to defend in good faith, this fact is always material and will often be received as a sufficient reason for not treating the judgment as res judicata, on the ground that, substantially, there has never been any litigation and decision of the questions involved.

■ Both this Court and the Supreme Court have traditionally adopted a liberal attitude regarding motions to set aside default judgments when good cause and equity so dictate. *Holcomb v. Creech,* 247 Ky. 199, 56 S.W.2d 998 (1933); *Crowder v. Commonwealth ex rel. Gregory,* Ky.App., 745 S.W.2d 149 (1988). We continue this tradition and direct that the default judgment rendered against the District be set aside. Of course, once the judgment upon which a plea of *res judicata* is based is set aside, the issue is no longer a viable one.

The notion that "litigation should end" is an important principle of jurisprudence. However, its import is eclipsed in the present context by the notion that "rights should be vindicated." Although on-going, complex litigation spawns protracted inconvenience for all concerned, we do not believe, in the present context, that the taxpayers' intervention will have the kind of prejudicial impact prohibited by the laches doctrine.

The final order/judgment from which this appeal is prosecuted is revised and this case is remanded to Bell Circuit Court with directions (1) to grant the appellants-taxpayers' motion to intervene; (2) to certify this as a class action according to CR 23; (3) to set aside the 1984 default judgment rendered in favor of the Bank against the District; and (4) to conduct further proceedings consistent with this opinion. Additionally, Bell Circuit Court shall order the Bank to forthwith deposit with the clerk of that court monies collected by it pursuant to the 1984 default judgment to be held in an interest-bearing account during the pendency of this action, or, in the alternative, the court shall order the Bank to post a suitable bond to secure repayment of said monies and interest in the event it does not ultimately prevail in this action.

The Bank's cross-appeal relating to sanctions is, in light of our decision allowing intervention, moot. Accordingly, the circuit court's refusal to impose sanctions is affirmed.

The order of October 24, 1990, directing payment of the District's indebtedness to Blakeman & Sons is unchallenged on appeal and is, therefore, affirmed.

McDONALD, J., concurs.

GUDGEL, J., concurs in part and dissents in part.

GUDGEL, Judge, concurring in part and dissenting in part:

The majority opinion goes far beyond what is necessary to resolve this appeal. Nevertheless, I concur in the result reached by the majority opinion to the extent that it holds that the court erred by finding that appellants' attempted intervention was untimely. However, I would limit the scope of our decision to that issue and would remand this case for further proceedings, leaving it to the trial court to first address the other procedural and/or substantive issues which remain as a result of our decision. For this panel to usurp the trial court's function and discretion in that vein is both unwarranted and unjustified. In short, I do not believe that it is a proper function of this Court to try cases. Therefore, I dissent from the majority opinion to the extent that it adjudicates issues other than the issue as to the timeliness of appellants' attempted intervention.