**RAM ENGINEERING & CONSTRUCTION, INC., et al., Appellants,**

v.

**UNIVERSITY OF LOUISVILLE, Appellee.**

No. 2001–SC–0264–DG.

Supreme Court of Kentucky.

Dec. 18, 2003.

Rehearing Denied March 18, 2004.

Robert C. Ewald, Virginia Hamilton Snell, Deborah H. Patterson, Wyatt, Tarrant and Combs, George Bruce Stigger, Alber Crafton PLLC, Louisville, M. Holliday Hopkins, Finance and Administration Cabinet, Frankfort, Counsel for Appellants.

Barbara R. Hartung, Greenebaum Doll & McDonald, Holland N. McTyeire, Greenebaum Doll & McDonald, Louisville, Counsel for Appellee.

GRAVES, Justice.

In August 1996, Appellee, the University of Louisville, began accepting bids for the construction of its new Papa John's Cardinal stadium in accordance with the Kentucky Model Procurement Code, KRS Chapter 45A. The University's construction plans involved seven different "packages," including Bid Package No. 1—Site Development, the subject of this case. After receiving all of the bids, the University determined that the low bids exceeded the construction budget. Pursuant to KRS 45A.090(2), the University negotiated with the three lowest bidders, which included Appellant, RAM Engineering and Construction, Inc. (RAM). On September 23, 1996, RAM was declared the lowest of the three bidders at $7,593,325.

MAC Construction and Excavating, Inc., the original low bidder, filed a protest with the University challenging the award of Bid Package No. 1 to RAM. The University denied the protest and, on September 26, 1996, issued a Notice to Proceed to RAM. MAC thereafter filed a declaratory judgment action against the University in the Franklin Circuit Court and sought to enjoin the University from commencing construction of the stadium. RAM neither received notice of nor was made a party to the action. That same day, the circuit court issued a Temporary Restraining Order preventing RAM from proceeding with construction. However, the TRO was never signed or entered into the record. MAC and the University subsequently entered into an agreed order, which was entered by the circuit court. The agreed order declared any prior award of Bid Package No. 1 null and void, and required the University to rebid the package once again.

On October 2, 1996, the University issued a third invitation to bid on the stadium project. RAM was once again the low bidder on Bid Package No. 1 at $6,993,900, which was $599,425 less than its previous bid. The University accepted RAM's bid and issued another Notice to Proceed on October 4, 1996. However, RAM filed a protest with the University, objecting to the reduction in the bid contract. The University denied the protest on the grounds that no contract had existed between RAM and the University following the previous bid, or that if it had existed, the University had the power to terminate the contract at its convenience.

RAM then filed an action in the Franklin Circuit Court seeking money damages for breach of the original bid contract. The circuit court ruled that although the University and RAM had entered into a valid and binding contract, the contract was rendered void by entry of the agreed order from the MAC litigation. The circuit court reasoned that entry of the agreed order constituted a substantial change in circumstances allowing the Uni-

versity to properly invoke the Termination for Convenience clause of the contract. Accordingly, summary judgment was entered in favor of the University.

The Court of Appeals upheld the summary judgment in favor of the University. Further, in rejecting RAM's due process argument that the agreed order voiding RAM's initial contract could have no effect because RAM had not been joined in the MAC litigation, the Court of Appeals held, "RAM had no right or ability to affect the outcome of the litigation" and thus, "was not denied due process, and was not an indispensable party to the MAC litigation."

This Court thereafter granted RAM's motion for discretionary review. RAM contends that it was an indispensable party to the MAC litigation and was entitled to participate and defend its contract with the University. RAM further argues that the lower courts erroneously found that the agreed order between the University and MAC constituted the substantial change in circumstances required for the University to terminate RAM's contract for convenience.

## I. INDISPENSABLE PARTIES

RAM argues that it should have been joined in the MAC litigation as a party needed for just adjudication pursuant to both CR 19.01 and the good faith obligations of the Kentucky Model Procurement Code. RAM posits that the Court of Appeals effectively rendered CR 19.01 and KRS 418.075 meaningless by refusing to require the presence of a successful bidder, in this case RAM, in an action challenging the public bidding process. *See Veith v. City of Louisville*, Ky., 355 S.W.2d 295 (1962).

MAC challenged the procedures used by the University for rebidding Bid Package No. 1. After the circuit court issued the Temporary Restraining Order, the Univer-

sity entered into an Agreed Order with MAC, rendering the bid contract with RAM null and void. The Court of Appeals found that RAM "was not a necessary party to [the] action, as RAM had no involvement in the actions complained of as being improper or unlawful." However, in *West v. Goldstein*, Ky., 830 S.W.2d 379 (1992), this Court held, "The true meaning of 'all necessary parties,' as stated in *Security Trust Co. v. Swope*, 274 Ky. 99, 118 S.W.2d 200 (1938), is that the term refers to those persons whose interest would be divested by an adverse judgment."

RAM's interest in the validity of the disputed bidding procedures was as great as any other possible party because the bidding resulted in the University's awarding the contract to RAM. RAM's interest in defending its contract fits squarely within the qualifications of a necessary party under CR 19.01(b), because its interest related to the validity of the bidding process through the awarded contract, and its absence from the action impaired RAM's ability to protect the contract. Even though RAM may have intervened after entry of the agreed order, *Rosenbalm v. Commercial Bank of Middlesboro*, Ky. App., 838 S.W.2d 423 (1992), it chose instead to enter into an agreement with the University whereby RAM would participate in the rebidding while retaining any rights from the first contract in order to expedite the commencement of construction in good faith. As we held in *City of Louisville v. Louisville Auto. Club*, 290 Ky. 241, 250, 160 S.W.2d 663, 668 (1942), wherein the city entered into a purchase contract for parking meters and citizens challenged the validity of the ordinance requiring meters, "The contract here involves a bit of money; it is but fit and proper that the interested contractor have his day in court." Accordingly, we con-

clude that RAM was, in fact, an indispensable party to the MAC litigation.

## II. FEDERAL PROCUREMENT LAW

The concept of termination for the government's convenience developed as a method to avoid procurement contracts after the close of the Civil War. The government, under certain circumstances, would terminate contracts and settle with the contractor for partial performance. *See generally Torncello v. United States*, 231 Ct.Cl. 20, 681 F.2d 756, 764–766 (1982), *explaining United States v. Corliss Steam–Engine Co.*, 91 U.S. 321, 23 L.Ed. 397 (1875), and Tim A. Thomas, Annotation, *Application, to Determination of Government's Liability Under Public Contract, of Doctrine of "Constructive" Invocation of Clause Authorizing Termination for Convenience of Government—Modern Cases*, 104 A.L.R.Fed. 661, 1991 WL 741686 (1991). Since the enactment of the first Federal Procurements Regulation in 1964, termination for convenience has "evolved into a principle for Government contracts of far-ranging varieties, both civilian and military." *Krygoski Const. Co., Inc. v. United States*, 94 F.3d 1537, 1541 (Fed.Cir.1996), *cert. denied*, 520 U.S. 1210, 117 S.Ct. 1691, 137 L.Ed.2d 819 (1997); *see also* 48 C.F.R. § 49.502 (1995). As explained by the 11th Circuit Court of Appeals, termination for convenience "permits the Government to terminate a contract, even in the absence of fault or breach by the other party, without incurring the usual financial consequences of breach." *Stock Equipment Co. v. Tennessee Valley Authority*, 906 F.2d 583, 586 note 3 (11th Cir.1990), *citing Maxima Corp. v. United States*, 847 F.2d 1549, 1552 (Fed.Cir.1988). While the law is clear that a contracting officer cannot terminate for convenience in bad faith simply to acquire a better bargain elsewhere, the federal courts have been inconsistent in enunciating a standard for exercising termination for convenience clauses.

In *Colonial Metals Co. v. United States*, 204 Ct.Cl. 320, 494 F.2d 1355 (1974), *overruled in Torncello, supra*, the Court of Claims upheld the Navy's termination for convenience of a contract for copper in order to obtain a better price, even though the Navy was aware of the better price at the time of the initial contract award. The court held to the accommodating standard that the government may terminate a contract for its convenience in good faith, "in the absence of some proof of malice or conspiracy." *Colonial Metals, supra*, at 1361. The *Colonial Metals* decision has been called "the high-water mark of courts' permissiveness in allowing the government to terminate for convenience." *Linan–Faye Const. Co., Inc. v. Housing Auth. of the City of Camden*, 49 F.3d 915, 924 (3d Cir.1995).

Subsequently, the Court of Claims, with six members sitting *en banc*, in *Torncello v. United States, supra*, overruled *Colonial Metals*. The plurality in *Torncello* enunciated the "substantial change in circumstances" standard, broadly restricting "the availability of the [termination for convenience] clause to situations where the circumstances of the bargain or the expectations of the parties have changed sufficiently that the clause serves only to allocate risk." 681 F.2d at 771. The *Torncello* court and later courts viewed the termination for convenience clause as allocating some of the risk of changed circumstances to the contractor. *Id.* at 763; *Erwin v. United States*, 19 Cl.Ct. 47, 53 (1989); *Maxima, supra*, 847 F.2d at 1552. The *Torncello* court defined the "substantial change of circumstances" standard as a change in the circumstances from the reasonable expectations of the parties at the time of the agreement. *Torncello, supra*, 681 F.2d at 766.

In 1984, Congress enacted the Competition in Contracting Act (CICA), (codified as amended in §§ 10, 31 and 41 U.S.C.), which articulated significant factors bearing on a contracting officer's decision to terminate a contract for the government's convenience. CICA requires executive agencies, when procuring property or services, to "obtain full and open competition through use of competitive procedures." 41 U.S.C. § 253(a)(1)(A). In *Krygoski Const. Co. v. United States, supra,* at 1543, the United States Court of Appeals for the Federal Circuit explained:

> This competitive fairness requirement, with its bid protest remedies, restrains a contracting officer's contract administration. If, for instance, a contracting officer discovers that the bid specifications inadequately describe the contract work, regulations promulgated under CICA may compel a new bid. *See* 10 U.S.C. § 2305; 48 C.F.R. § 1.602–2. Thus, to accommodate CICA's fairness requirements, the contracting officer may need to terminate a contract for the Government's convenience to further full and open competition. 48 C.F.R. § 1.602–2(b); *see* 41 U.S.C. § 414 (1994). Thus, to further its full competition objective, CICA permits a lenient convenience termination standard.

In the wake of CICA, the *Krygoski* court limited the applicability of *Torncello* to situations where "the Government enters into a contract with no intention of fulfilling its promises." *Krygoski,* 94 F.3d at 1543–44 (*citing Salsbury Industries. v. United States,* 905 F.2d 1518 (Fed.Cir. 1990), *cert. denied,* 498 U.S. 1024, 111 S.Ct. 671, 112 L.Ed.2d 664 (1991)). Instead, the court enunciated a "cardinal change in cir-cumstances" standard requiring "an alteration in the work so drastic that it effectively requires the contractor to perform duties materially different from those originally bargained for." *Krygoski, supra.* Nonetheless, three years later in *T & M Distributors, Inc. v. United States,* 185 F.3d 1279, 1284 (Fed.Cir.1999), a subsequent panel of the same federal Court of Appeals held, "[A] cardinal change is not a prerequisite for a valid termination for convenience." *See also Custom Printing Co. v. United States,* 51 Fed. Cl. 729 (2002).

## III.  KENTUCKY MODEL PROCUREMENT CODE

The Kentucky Model Procurement Code requires that all government construction contracts exceeding $50,000 include a "termination for convenience" clause.[1] Article 22 of the University's contract with RAM stipulated that the University "may terminate the contract for its own convenience when it is determined by the contracting authority that such termination will be in the best interest of the University," and provided for compensation of the contractor's expenses "paid or incurred in the performance of the contract."

Termination for convenience clauses required by the Model Procurement Code are subject to the good faith and fair dealing requirements set forth in KRS 45A.015(2):

> Every contract or duty under this code shall impose an obligation of good faith in its performance or enforcement. "Good faith" shall mean honesty in fact

---

1.  "[T]here shall also be specified for inclusion in all construction contracts expected to exceed fifty thousand dollars ($50,000) in price a clause providing that a contract may be terminated for the convenience of the Commonwealth or for default, and further providing for liquidated damages when appropriate and as specified in the contract schedule, with excuses for nonperformance specifically provided for therein." KRS 45A.200(2).

in the conduct or transaction concerned and the observance of reasonable commercial standards of fair dealing.

■ This good faith obligation is recognized and explained in our case law, "In every contract, there is an implied covenant of good faith and fair dealing. 17A Am.Jur.2d *Contracts* section 380; KRS 355.1–203. Indeed, it may be said that contracts impose on the parties thereto a duty to do everything necessary to carry them out. *Beech Creek Coal Co. v. Jones*, Ky., 262 S.W.2d 174 (1953)." *Ranier v. Mount Sterling National Bank*, Ky., 812 S.W.2d 154, 156 (1991); *see also Kentucky Utilities Co. v. South East Coal Co.*, Ky., 836 S.W.2d 392, 405 (1992), *cert. dismissed*, 506 U.S. 1090, 113 S.Ct. 1147, 122 L.Ed.2d 498 (1993). The fact that Kentucky's obligation of good faith arises not only from the UCC, but also from the same source that requires termination for convenience, the Model Procurement Code, negates any argument that the covenant of good faith cannot supplant explicit terms of the contract, because the terms of the contract and the obligation of good faith originate concurrently.

■ The Kentucky Model Procurement Code holds the government to the same standard of good faith and fair dealing as private parties. KRS 45A.015. Although the government may terminate contracts for convenience, that cannot supersede the good faith duty to do "everything necessary" to carry out the contract. Kentucky's recognition of good faith as "a duty to do everything necessary to carry [the contract] out," *Kentucky Utilities, supra*, limits the contracting officer's discretion to terminate a contract for convenience and indicates that a change of circumstances standard is best for Kentucky. Interpreting termination for convenience clauses required by the Code in the light of the duty of good faith and fair dealing obligations of that same Code is reasonable. And if we must presume that government officials act in good faith to contract in their best interest at the time of the agreement, *Linan–Faye, supra*, then a change in circumstances is necessary for the contract to no longer be in the government's best interest when terminating for convenience.

■ KRS 45A.010, Construction—purposes and policies, provides,

(1) This code shall be liberally construed and applied to promote its underlying purposes and policies.

(2) The underlying purposes and policies of this code shall be:

(a) To simplify, clarify, and modernize the law governing purchasing by the Commonwealth;

(b) To permit the continued development of purchasing policies and practices;

(c) To make as consistent as possible the purchasing laws among the various states;

(d) *To provide for increased public confidence in the procedures followed in public procurement;*

(e) *To insure the fair and equitable treatment of all persons who deal with the procurement system of the Commonwealth;*

(f) To provide increased economy in state procurement activities by fostering effective competition; and

(g) *To provide safeguards for the maintenance of a procurement system of quality and integrity.* [emphasis added].

The primary function of the Model Procurement Code is to benefit citizens of the Commonwealth. *Ohio River Conversions, Inc. v. City of Owensboro*, Ky.App., 663

S.W.2d 759 (1984). Subsections (d), (e), and (g) emphasize the importance of good faith and fair dealing. The substantial change in circumstances standard for determining good faith in a termination for convenience advances these policies. Public confidence in government procurement procedures will increase, as section (d) encourages, because the public will know that the government cannot simply excuse itself from a contract for any reason, or for no reason at all. The public should have no cause to doubt the honesty of the officials of this Commonwealth.

■ Similarly, interpreting termination for convenience as allowing the government to terminate without a substantial change of circumstances would not advance the fairness policies of KRS 45A.010(e). While contractors ought to expect the government to terminate a contract when it is in its best interest to do so, it is also reasonable for them to expect that the government's interest will only change if the circumstances surrounding the contract substantially change. Courts often interpret good faith based on the parties' reasonable expectations of the meaning of the provisions of the contract. *Corenswet, Inc. v. Amana Refrigeration, Inc.*, 594 F.2d 129, 138 (5th Cir.1979), *cert. denied*, 444 U.S. 938, 100 S.Ct. 288, 62 L.Ed.2d 198 (1979). The purposes and policies of the Code set forth in KRS 45A.010 are best implemented by requiring a substantial change in circumstances, thus ensuring that Kentucky's procurement system is one of quality and integrity.

Furthermore, if there is no good faith limitation set by a change of circumstances, then the government's contracted-for promise becomes illusory:

[T]he courts in general require that before mutual promises will be enforced, each as the consideration of the other, each party must promise to do something which will yield a benefit or advantage to the other, or which will result in a detriment or disadvantage to himself in exchange for the other promise. Whatever may be the character of the thing promised, as a general rule it cannot serve as consideration unless it is binding.

. . .

Where an illusory promise is made, that is, a promise merely in form, but in actuality not promising anything, it cannot serve as consideration. Even if it were recognized by law, it would impose no obligation, since the promisor always has it within his power to keep his promise and yet escape performance of anything detrimental to himself or beneficial to the promissee. In such cases, the promisor may perform or not, solely on the condition of his whim, his promise will not serve as consideration.

7 Williston on Contracts, § 7:6, at 77–79, and § 7:7, at 88–89 (4th ed.1992). Although the termination for convenience clause requires the government to compensate a contractor for costs, if those costs and the government's determination of its best interest represent the only consideration for the contract, then the government may be procuring "something for nothing." *David Roth's Sons, Inc. v. Wright & Taylor, Inc.*, Ky., 343 S.W.2d 389, 391 (1961). The "reasonable commercial standards of fair dealing" required by KRS 45A.015(2) further require valuable government consideration in procurements by the Commonwealth.

Furthering the purpose of the Code, the termination for convenience clause of the contract should be "liberally construed and applied to . . . (e) insure the fair and equitable treatment of all persons who deal with the procurement system of the Commonwealth," KRS 45A.010(e). The interests of fair treatment and public confi-

dence in the government from the Model Procurement Code outweigh possible expenses on the public coffers, within the reasonable limits of a substantial change from the parties' expectations.

## IV. CHANGE OF CIRCUMSTANCES IN THE UNIVERSITY'S CONTRACT

The University argues that the MAC litigation, the issuance of the Temporary Restraining Order, and the Agreed Order each provided the necessary substantial change in circumstances to justify a termination for convenience of its contract with RAM. We disagree.

Neither the MAC litigation nor the Temporary Restraining Order was sufficient to justify a termination for convenience. Although the litigation may have eventually delayed construction of the stadium beyond the construction deadlines, and may have resulted in an increased cost, neither event had yet occurred. In fact, construction was not delayed because RAM rebid and resumed work in good faith.

Further, Article 24(A)(2) of the bid contract provided for the possibility of a court-ordered construction delay by stipulating that such a delay for a period of up to 90 days "shall not constitute cause for termination." While interpretation of Article 24(A)(2) is not necessary to reach a decision in this case, its inclusion in the contract illustrates the parties' anticipation of possible legal delays without suggesting that the University could terminate in the event of such a delay.

Similarly, the Agreed Order cannot be considered a substantial change justifying the University's termination of the contract, because the University itself is responsible for it. If the government can exercise a termination for convenience clause based on a situation the

contracting officials themselves are responsible for, the clause becomes merely an exculpatory provision. Stephen N. Young, "Limiting the Government's Ability to Terminate for its Convenience following Torncello", 52 Geo. Wash. L.Rev. 892, 903 (1984). Relying on circumstances the University itself created simply is not grounds for termination under the changed circumstances standard. The lower courts agreed that, "while the effect of the TRO may have been to merely delay construction, the effect of the Agreed Order was to terminate the contract." We are of the opinion that to reason that termination of the contract justified terminating the contract illustrates the absurdity of allowing the University's own actions to justify the termination for convenience. The MAC litigation, the Temporary Restraining Order, and the Agreed Order did not change "the circumstances of the bargain or the expectations of the parties" significantly enough to justify termination of the University's contract with RAM. *Torncello,* 681 F.2d at 771.

The Court of Appeals' opinion affirming the summary judgment of the Franklin Circuit Court is therefore reversed and we remand this matter to the Franklin Circuit Court for further proceedings in accordance with this opinion.

KELLER, STUMBO, and WINTERSHEIMER, J.J., concur.

JOHNSTONE, J., dissents in a separate opinion in which LAMBERT, C.J., and COOPER, J., join.

JOHNSTONE, Justice, dissenting.

I respectfully dissent because I disagree with the majority's conclusion that the outcome of the litigation between MAC Construction & Excavating, Inc. ("MAC") and the University of Louisville ("U of L") was not a substantial change of circumstances that allowed U of L to cancel the original

contract between RAM Engineering & Construction, Inc. ("RAM") and U of L. But before explaining the reasons for my dissent, I take a moment to address the majority's discussion regarding the question of whether RAM was an indispensable party to this litigation.

CR 19.01 provides in pertinent part:

A person who is subject to service of process, either personal or constructive, shall be joined as a party in the action if (a) in his absence complete relief cannot be accorded among those already parties, or (b) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.

As noted by the majority, RAM did not move to intervene in this action even though it could have. *Op.* at 582, 583. Thus, the issue here is not whether the trial court erred in denying RAM's motion to intervene, and the considerations of CR 19.01(b) do not apply. Therefore, the indispensable party issue is limited to the question of whether the trial court should have *sua sponte* joined RAM because "complete relief cannot be accorded among those already parties."

The Court of Appeals correctly concluded that the trial court did not err in failing to join RAM, because RAM was not a necessary party to MAC's claim that the bidding procedure used by U of L was unlawful. That is, inclusion of RAM in the proceedings was not necessary to accord "complete relief" to either MAC or U of L. True, the Agreed Order did have the effect of voiding U of L's contract with RAM, but it did *not* do so via construction or interpretation of that contract. This left MAC with full legal recourse for its claim of breach of contract, which is what RAM raised in the underlying law suit. I now turn to the question of whether the Agreed Order was a substantial change of circumstances that allowed U of L to cancel its original contract with RAM under the termination for convenience clause.[1]

I strongly disagree with the majority's conclusion that the MAC litigation and the entry of the Temporary Restraining Order were not sufficient changes in circumstances to justify canceling the original RAM contract under the termination for convenience clause. This clause provided that U of L could cancel the contract when it was in U of L's best interest to do so.

The majority found these events to be insufficient reasons to cancel the contract because "[a]lthough the litigation may have eventually delayed construction of the stadium beyond the construction deadlines, and may have resulted in an increased cost, neither event had yet occurred." *Op.* at 587. On the contrary, the possibility of delay in construction made it strongly in U of L's best interest to cancel the contract in order to prevent the delay from occurring.

To benefit from the construction of the stadium, U of L had to be able to use it. The stadium's primary use is for college football games. Consequently, U of L had a strong interest in seeing that construction of the stadium was done timely because its use is tied to a time period—the college football season—that it cannot change. The majority reasons that U of L should have waited until delay was not just a possibility, but an actual fact. But at that point, U of L may have had a lot less

---

1. I find it curious that the majority chooses to address this issue after holding that RAM was an indispensable party to the litigation between MAC and U of L. If true, this holding should have resolved the case.

reason to cancel the contract, because the opportunity to use the stadium for the 1998 football season may well have been lost along with the considerable revenues and profits generated by the new stadium.[2] In other words, the majority is punishing U of L for not litigating this action. In so doing, the majority fails to recognize that sometimes it is better to retreat than to fight.

The majority holds U of L "responsible" for its retreat, *i.e.*, entering into the Agreed Order, and implies that it acted in bad faith by doing so. This is simply not true. The temporary restraining order entered against U of L was not an adjudication of liability or fault by U of L. Rather, the temporary restraining order caused U of L to enter into the Agreed Order with MAC even though it "dispute[d] MAC's claims and its entitlement to any relief." U of L did so because it "believe[d] time [was] of the essence in the construction of the Stadium and it [was] in its best interest to resolve [the litigation] as quickly as possible." In other words, U of L weighed its options and concluded that entering into the Agreed Order was its best course of action. U of L merely made the best of a bad situation. Thus, what U of L is ultimately "responsible" for is acting prudently in its own best interest. Therefore, it was entitled to cancel the contract with RAM under the termination for convenience clause, and therefore I dissent.

LAMBERT, C.J., and COOPER, J., join this dissenting opinion.

---

**2.** One source puts the profits generated by the stadium during its first year of use at $1.6 million. *See* *http://www.sfo.com/* čsuppes/NCAA/ConfUSA/index.htm? Louisville/index.htm visited on November 12, 2003. The potential loss of such a considerable and expected sum would certainly seem to be a substantial change of circumstances brought about by the specter of delay created by the MAC litigation.