**LOUISVILLE ARENA AUTHORITY, INC., Appellant**

v.

**RAM ENGINEERING & CONSTRUCTION, INC.; Richard C. Chilton; William W. Chilton, III; The Finance and Administration Cabinet; M.A. Mortenson Company; and Veit & Company, Inc., Appellees.**

and

**Commonwealth of Kentucky, Finance and Administration Cabinet, Appellant**

v.

**Ram Engineering and Construction, Inc.; Richard C. Chilton; William W. Chilton, III; Louisville Arena Authority, Inc; M.A. Mortenson Company; and Veit Company, Inc., Appellees.**

and

**Commonwealth of Kentucky, Finance & Administration Cabinet, Appellant**

v.

**Ram Engineering and Construction, Inc.; Richard C. Chilton; William W. Chilton, III; Louisville Arena Authority, Inc; M.A. Mortenson Company; and Veit Company, Inc., Appellees.**

Nos. 2011–CA–001389–MR, 2011–CA–001421–MR, and 2011–CA–001969–MR.

Court of Appeals of Kentucky.

Aug. 30, 2013.

Rehearing Denied Nov. 6, 2013.

Sheryl G. Snyder, Griffin Terry Sumner, C. Michael Shull, Louisville, KY, for Appellant Louisville Arena Authority.

Richard M. Sullivan, Kenneth A. Bohnert, Scott A. Johnson, Edward F. Busch, Louisville, KY, E. Jeffrey Mosley, Frankfort, KY, for Appellant Finance and Administration Cabinet, Commonwealth of Kentucky.

Deborah H. Patterson, Donald J. Kelly, Rania M. Basha, G. Bruce Stigger, Louisville, KY, for Appellees Ram Engineering & Construction, Inc., Richard C. Chilton and William W. Chilton, III.

Before CAPERTON, STUMBO and THOMPSON, Judges.

## OPINION

THOMPSON, Judge:

These consolidated appeals arise from the procurement of subcontractors for the construction of the KFC Yum! Center (Arena) in downtown Louisville and involve the claims of Ram Engineering & Construction, Inc., an unsuccessful subcontract bidder on the project, and its principals, Richard C. Chilton and William W. Chilton, III, as taxpayers of the Commonwealth of Kentucky (collectively referred to as RAM). The Louisville Arena Authority, Inc. (LAA) and the Commonwealth of Kentucky, Finance and Administration Cabinet filed these interlocutory appeals after the circuit court denied their motions for summary judgment based on sovereign and governmental immunity.

## BACKGROUND

The Arena was a project completed under the authority of the LAA, a nonprofit corporation formed to create, finance, develop and oversee the construction and management of the multi-use Arena. The LAA was established on December 12, 2005, by Executive Order of Governor Ernie Fletcher and, pursuant to that same order, the Secretary of Commerce, James Host, would serve as Chairman of the Board of Directors, and the Governor would appoint ten members of the Board and the Mayor of Louisville would appoint five members.

The LAA received a portion of the initial funding for the $225 million Arena from a $75 million grant from the Commonwealth through a budget appropriation contained in House Budget Bill 380. Budget Bill 380 noted that "the Arena was a public project intended for multiple uses as a public,

recreational, cultural, and sports facility." It further stated that the bond funds were conditioned upon the LAA conducting all business in accordance with the applicable provisions of KRS 45A, Kentucky's Model Procurement Code (KMPC). The Budget Bill further stated:

Any additional debt issued by any other entity other than the Commonwealth shall not constitute a debt of the Commonwealth or a pledge of the faith and credit of the Commonwealth. Nor shall any debt issued by any other entity other than the Commonwealth be deemed, directly or indirectly, to be a moral obligation of the Commonwealth. In no case shall the Commonwealth pay for any construction cost overruns or operating costs associated with the Louisville Arena.

The LAA decided that, as authorized by the KMPC, it would use the proposal-solicitation process referred to as "Construction Manager–At–Risk" (CMAR). The process is authorized by KRS 45A.030(6) where it is defined as "a project delivery method in which the purchasing officer enters into a single contract with an offeror that assumes the risk for construction at a contracted guaranteed maximum price as a general contractor, and provides consultation and collaboration regarding the construction during and after design of a capital project."

On January 5, 2007, the LAA sent a "Request for Proposal" to various construction firms indentified as potential CMARs. Ultimately, the LAA awarded the contract to M.A. Mortenson Company and the parties entered into a CMAR agreement on August 20, 2007.

On April 17, 2008, Mortenson solicited proposals for the performance of certain subcontractor work on the Arena and RAM responded with a bid. On June 9, 2008, RAM was informed by Mortenson

that Veit & Company, Inc., a RAM competitor, was awarded the subcontracts on which RAM bid.

On June 23, 2008, pursuant to KRS 45A.285, RAM filed an administrative protest of the subcontract award with the Finance Cabinet alleging violations of the KMPC procurement process. On August 11, 2008, the Finance Cabinet denied RAM's protest on the basis that although the LAA was subject to the KMPC, subcontract procurement under the CMAR delivery method was not subject to the KMPC and, therefore, RAM lacked standing to complain.

On September 10, 2008, RAM filed a complaint in the Franklin Circuit Court seeking judicial review of the Finance Cabinet's decision. In the complaint, it was alleged that the Finance Cabinet's decision was arbitrary, capricious and contrary to law and, further, that the LAA's and Finance Cabinet's failure to abide by the law and their wrongful/illegal expenditure of taxes violated Section 2 of the Kentucky Constitution prohibiting arbitrary state action. It was alleged that any payment to Mortenson was void and a misuse of taxpayer funds. Although the original complaint did not assert the existence of a written contract, the prayer for relief sought monetary damages.

The complaint was subsequently amended to allege three additional claims: (1) that RAM was a third party beneficiary of the contractual relationship between the Commonwealth and the LAA arising from the legislative appropriation in Budget Bill 380; (2) KMPC violations; and (3) a violation of implied and statutory covenants of good faith and fair dealing. In its prayer for relief, RAM again sought monetary damages.

Initially, the LAA moved for summary judgment arguing that it was not a public agency and, although it had utilized a KMPC authorized process, it was not required to comply with the KMPC. The circuit court disagreed and found the LAA was acting as the "alter ego" of the Finance Cabinet for purposes of the KMPC. The LAA then filed a motion for partial summary judgment on the monetary claims against it asserting because the circuit court found it was acting as the alter ego of the Finance Cabinet, it was entitled to immunity. Further, it argued the KMPC did not permit a private cause of action for lost profits and attorney fees. The Finance Cabinet moved for summary judgment on similar grounds.

The circuit court found there is no private cause of action for lost profits by unsuccessful bidders under the KMPC and dismissed those claims. It reasoned that lost profits could be claimed only where a valid contract exists or promissory estoppel applied and neither existed in this case. However, it denied the motion to dismiss the claims for attorney fees finding an allegation of bad faith could entitle RAM to a trial on that issue. Because the LAA's activity in the construction and operation of the Arena was proprietary rather than governmental in nature, the circuit court denied the LAA's motion for partial summary judgment on the basis of governmental immunity. The LAA filed an interlocutory appeal from that part of the circuit court's order denying it immunity. Subsequently, the circuit court clarified that its denial of partial summary judgment to the LAA also included its denial of immunity to the Finance Cabinet and the Cabinet appealed.

The LAA and the Finance Cabinet moved to stay the forthcoming trial proceedings during the pendency of the appeals. Contrary to its earlier holding, the circuit court held that a contract claim remained below. Concluding that the KMPC contains an express waiver of im-

munity for contract claims, the circuit court refused the motion to stay the proceedings. The Finance Cabinet filed an appeal from the order denying a stay.

A motion panel of this Court considered and granted the Finance Cabinet's motion to consolidate the appeals. RAM's motion to dismiss the appeals as interlocutory was denied. Finally, the LAA's and the Finance Cabinet's motions for intermediate relief to stay the proceedings below were granted.

Although the Finance Cabinet appealed from the circuit court's order denying its motion to stay the proceedings, that issue was resolved by a motion panel of this Court and that appeal is now moot. That same motion panel also concluded that the denial of immunity from monetary damages to the Finance Cabinet and the LAA were immediately appealable based on *Breathitt County Bd. of Educ. v. Prater,* 292 S.W.3d 883 (Ky.2009) (holding that an order denying summary judgment to a party asserting immunity is appealable).

*Prater* expresses the current view in this jurisdiction. However, after review of the record and the parties' briefs, we make a prefatory comment before deciding the issues regarding immunity. So that our opinion is not misunderstood, we have strived not to comment on the merits of the underlying claims or suggest any damages that may be recovered from a nonimmune entity. Such issues are properly presented in an appeal from a final order.

## STANDARD OF REVIEW

■ Summary judgment is only proper when "it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor and against the movant." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.,* 807 S.W.2d 476, 483 (Ky.1991) (internal quotation omitted). In ruling on a motion for summary judg-

ment, the Court is required to construe the record "in a light most favorable to the party opposing the motion ... and all doubts are to be resolved in his favor." *Id.* at 480. A party opposing a summary judgment motion "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Id.* at 481 (internal quotations omitted). Whether the Finance Cabinet and the LAA are immune from suit is a question of law, which we review *de novo.* *Rowan County v. Sloas,* 201 S.W.3d 469, 475 (Ky.2006).

## THE KMPC

■ The KMPC is contained in KRS Chapter 45A and applies "to every expenditure of public funds by the Commonwealth[.]" KRS 45A.020(1). Its provisions were enacted to hold "the government to the same standard of good faith and fair dealing as private parties." *RAM Engineering & Const., Inc. v. University of Louisville,* 127 S.W.3d 579, 585 (Ky.2003). KRS 45A.010, entitled "Construction; purposes and policies," specifies:

(1) This code shall be liberally construed and applied to promote its underlying purposes and policies.

(2) The underlying purposes and policies of this code shall be:

. . . .

(e) To insure the fair and equitable treatment of all persons who deal with the procurement system of the Commonwealth;

(f) To provide increased economy in state procurement activities by fostering effective competition; and

(g) To provide safeguards for the maintenance of a procurement system of quality and integrity.

Broadly stated, the reason for enactment of the KMPC was to benefit Kentucky's citizens. *RAM Engineering & Const. Inc,* 127 S.W.3d at 585.

Prior to the enactment of the KMPC, only a taxpayer had standing to challenge an award of a public contract in violation of competitive bidding statutes. *Gay v. Haggard,* 133 Ky. 425, 118 S.W. 299 (1909). Because a disappointed bidder's interest was only a mere expectancy in the award of a contract, a disappointed bidder had no standing to make the same challenge unless there were specific allegations of fraud, collusion or dishonesty. *Commonwealth v. Yamaha Motor Mfg. Corp.,* 237 S.W.3d 203, 205 (Ky.2007). However, the KMPC "changed the rules of the game." *Pendleton Bros. Vending, Inc. v. Com. Finance and Admin. Cabinet,* 758 S.W.2d 24 (Ky.1988).

By enacting the KMPC, the General Assembly elevated the standard of conduct for the Commonwealth's procuring entities. To further its purposes, the KMPC expanded standing to challenge an award of a public contract to a class of disappointed bidders who previously lacked standing. KRS 45A.285 expressly provides for an administrative protest by a disappointed bidder, stating:

(1) The secretary of the Finance and Administration Cabinet, or his designee, shall have authority to determine protests and other controversies of actual or prospective bidders or offerors in connection with the solicitation or selection for award of a contract.

(2) Any actual or prospective bidder, offeror, or contractor who is aggrieved in connection with the solicitation or selection for award of a contract may file a protest with the secretary of the Finance and Administration Cabinet. A protest or notice of other controversy must be filed promptly and in any event within two (2) calendar weeks after such aggrieved person knows or should have known of the facts giving rise thereto. All protests or notices of other controversies must be in writing.

Although KRS 45A.285(4) states that the "decision by the secretary of the Finance and Administration Cabinet shall be final and conclusive," in *Pendleton Bros.,* our Supreme Court held that judicial review was available to a disappointed bidder:

This proviso must be construed to mean 'final and conclusive' for administrative purposes, not as a barrier against judicial review. To construe it otherwise would be to grant the Secretary plenary power. We have recently decided a similar question in *Humana of Ky., Inc., et al. v. NKC Hospitals, Inc., et al.,* Ky., 751 S.W.2d 369 (1988), applying the principle that the 'supremacy of law demands that there shall be opportunity to have some court decide' whether an agency administering a statutory regulatory scheme has applied 'an erroneous rule of law ... and whether the proceedings in which the facts were adjudicated was conducted regularly.' *See Humana,* at 374.

As in *Humana,* here it is the regulatory scheme which both establishes the rules which must be followed and provides standing to the aggrieved competitor to challenge the decision of the administrative agency in court if he can prove that the decision or award was made in violation of the statute.

*Pendleton Bros.,* 758 S.W.2d at 28.

Notably, in *Pendleton,* the complaint sought monetary damages. However, the Court did not suggest that such a remedy could be pursued in an action to seek review of the secretary's decision. The Court clarified that it "decided only that ... the allegations of the complaint, although inartfully drawn, are sufficient to

state a cause of action for declaratory and/or injunctive relief[.]" *Id.* at 30.

In addition to conferring standing on disappointed bidders to file administrative protests and seek judicial review, the KMPC substantially changed the law regarding sovereign immunity. In *Foley Const. Co. v. Ward,* 375 S.W.2d 392, 396 (Ky.1964), the Court held that sovereign immunity precluded an action against the Commonwealth for breach contract without express legislative consent. By enacting KRS 45A.245, the General Assembly waived immunity for contract actions involving the Commonwealth and its agencies. *University of Louisville v. RAM Engineering & Const., Inc.,* 199 S.W.3d 746, 749 (Ky.App.2005). KRS 45A.245 provides:

> (1) Any person, firm or corporation, having a lawfully authorized written contract with the Commonwealth at the time of or after June 21, 1974, may bring an action against the Commonwealth on the contract, including but not limited to actions either for breach of contracts or for enforcement of contracts or for both. Any such action shall be brought in the Franklin Circuit Court and shall be tried by the court sitting without a jury. All defenses in law or equity, except the defense of governmental immunity, shall be preserved to the Commonwealth.
>
> (2) If damages awarded on any contract claim under this section exceed the original amount of the contract, such excess shall be limited to an amount which is equal to the amount of the original contract.

## THE AVAILABILITY OF MONETARY DAMAGES TO THE CHILTONS AS TAXPAYERS

■ Taxpayers have the right to bring an action challenging the payment of taxpayer funds in violation of competitive bidding laws and recover those funds on the public's behalf. *Board of Ed. of Floyd County v. Hall,* 353 S.W.2d 194 (Ky.1962). "Nevertheless, from the very nature of a taxpayer's suit there must be some reasonable relationship between the particular relief sought and the public interest. There is bound to be a limit to what can be done for an individual proceeding under the guise of an affronted taxpayer." *Norrell v. Judd,* 387 S.W.2d 7, 9 (Ky.1965).

Although the Chiltonses filed this action as taxpayers, the relief sought is for the monetary damages RAM incurred, not the taxpayers. Even if a taxpayer can recover monetary damages for a violation of the KMPC, any recovery would have to benefit the public. Here, the taxpayers could have no interest in, or benefit from, an award of money damages to RAM. To the contrary, such an award to be paid by the taxpayers would be detrimental to the taxpayers. "At this point the mask has been dropped and the suits assume a mien not only more private than public, but private altogether." *Id.* at 10. We proceed with our immunity analysis with the nature of this action in mind.

## ARE MONETARY DAMAGES RECOVERABLE AGAINST THE FINANCE CABINET?

■ We preface our discussion with the clarification that no official or employee of the Finance Cabinet has been named in an individual capacity. Consequently, we are not concerned with qualified official immunity and the distinctions between ministerial and discretionary functions. Instead, we are concerned with sovereign immunity and whether it has been waived.

■ Sovereign immunity "is a concept that arose from the common law of England and was embraced by our courts at an early stage in our nation's history. It is an inherent attribute of a sovereign

state that precludes the maintaining of any suit against the state unless the state has given its consent or otherwise waived its immunity." *Yanero v. Davis,* 65 S.W.3d 510, 517 (Ky.2001) (citation omitted). The Court pointed out that the concept of sovereign immunity is an inherent attribute of the state. *Id.* However, only the Commonwealth and counties enjoy sovereign immunity. *Comair, Inc. v. Lexington–Fayette Urban County Airport Corp.,* 295 S.W.3d 91, 94 (Ky.2009).

The question is not whether the Finance Cabinet is entitled to sovereign immunity: As a direct arm of the Commonwealth, it undeniably is. The question is whether the General Assembly has waived immunity by its enactment of any of the provisions contained in the KMPC.

 If it has been determined that an entity is entitled to immunity, a Court cannot "refuse to apply it or abrogate the legal doctrine." *Withers v. University of Kentucky,* 939 S.W.2d 340, 344 (Ky.1997). Immunity can be waived by the General Assembly only where stated "by the most express language or such overwhelming implications from the text as [will] leave no room for any other reasonable construction." *Id.* at 346 (internal citations and quotations omitted). "Statutes in derogation of the state's sovereign immunity will be strictly construed in favor of the state unless the intention of the legislature to do otherwise is clearly expressed in the statute." *Jones v. Cross,* 260 S.W.3d 343, 345 (Ky.2008). Consequently, a waiver of sovereign immunity cannot be assumed by the courts. *Board of Trustees of Kentucky Retirement Systems v. Com., Board of Claims,* 251 S.W.3d 334, 340 (Ky.App. 2008).

Although RAM had standing to seek judicial review of the denial of its protest by the Secretary of the Finance Cabinet and could have sought an injunction to stay any action pursuant to an allegedly void contract, RAM did not seek that relief. At this point, the Arena has been constructed and the challenged contract has been completed.

 In *St. Matthews Fire Protection Dist. v. Aubrey,* 304 S.W.3d 56 (Ky.App. 2009), the Court recognized the distinction between an action to conform a state actor's future conduct to the law, as opposed to monetary damages for past conduct: "A litigant may not by the mere expedient of proceeding under the declaratory judgment act obtain relief which would be denied to him in a direct proceeding brought to obtain that particular relief." *Id.* at 60 (quoting *George v. Bernheim Distilling Co.,* 300 Ky. 179, 188 S.W.2d 321, 324 (1945)).

There is no express statutory language in the KMPC waiving immunity and permitting a disappointed bidder to recover damages against the Commonwealth based on violations of the KMPC. Consequently, unless there are "overwhelming implications from the text as [will] leave no room for any other reasonable construction," we must conclude that no action can be maintained against the Commonwealth for violations of the KMPC. *Withers,* 939 S.W.2d at 346.

We can find no language in the text that compels this Court to hold the General Assembly waived the Commonwealth's immunity for claims that it violated the KMPC. The KMPC was enacted to benefit the taxpayers, not to provide compensation to a disappointed bidder. *RAM Engineering & Const., Inc.,* 127 S.W.3d at 585. It is not unreasonable to conclude that the General Assembly did not intend to further burden the taxpayers by waiving the Commonwealth's immunity from monetary damages.

■ The General Assembly has expressly waived the Commonwealth's immunity on claims based on written contracts. However, because it is a statute waiving sovereign immunity, it must be strictly and narrowly construed. In *Commonwealth v. Whitworth,* 74 S.W.3d 695 (Ky.2002), the Court rejected a contention that the waiver of immunity for written contracts in KRS 45A.245(1) includes a waiver of immunity for suing on an oral contract. Citing *Withers,* the Court reiterated that "the state cannot be sued except upon a specific and explicit waiver of sovereign immunity." *Id.* at 699.

Although the circuit court's orders are somewhat contradictory, it appears that the circuit court has not determined whether there was a written contract. Consequently, we are without authority to consider whether such a contract exists. However, RAM's claims for monetary damages not based on a written contract are precluded by sovereign immunity.

## IS THE LAA ENTITLED TO IMMUNITY?

The LAA presented its claim of immunity only after the circuit court found that the LAA was the "alter ego" of the Finance Cabinet for the purpose of the KMPC. Prior to that order, the LAA argued in its January 11, 2010, motion for summary judgment that it was not a governmental agency and, therefore, did not fall within the purview of the KMPC. On appeal, it argues: "Assuming arguendo that the LAA is the 'alter ego' of the Finance Cabinet-as the circuit court expressly found-then the LAA must also be entitled to sovereign immunity."

Given the LAA's conflicting positions in this case, we find its belated claim of immunity somewhat disingenuous. Although certainly a party can assert inconsistent legal theories as defenses, its claim that it is a governmental agency is not based on any factual basis presented to this Court, but only an assumption derived from the circuit's order addressing the KMPC. As earlier stated, we have intentionally limited our review to the immunity question. Other interlocutory orders entered by the circuit court and any findings are not properly reviewable by this Court and are subject to review only after entry of a final order. However, because of the unusual procedural history of this case, we accept the LAA's most recent proposition that it is a governmental agency for the purpose of determining immunity. Our inquiry turns to the complexities inherent in this Commonwealth's law regarding governmental immunity.

Although, the LAA has taken different positions regarding its status as a public or private entity, it is clear to this Court that it is not the Commonwealth or a county and does not enjoy sovereign immunity. It is a private nonprofit corporation and, if it is entitled to immunity at all, it is governmental immunity. *Yanero,* 65 S.W.3d at 519.

■ Governmental immunity is an offshoot of sovereign immunity but derived from a different source. *Id.* Its origin was explained in *Yanero:*

> The principle of governmental immunity from civil liability is partially grounded in the separation of powers doctrine embodied in Sections 27 and 28 of the Constitution of Kentucky. The premise is that courts should not be called upon to pass judgment on policy decisions made by members of coordinate branches of government in the context of tort actions, because such actions furnish an inadequate crucible for testing the merits of social, political or economic policy.

*Id.* Unlike sovereign immunity, which operates as a complete shield from liability,

governmental immunity "shields state agencies from liability for damages only for those acts which constitute governmental functions, *i.e.*, public acts integral in some way to state government." *Prater*, 292 S.W.3d at 887. Immunity does not extend to "agency acts which serve merely proprietary ends, *i.e.*, non-integral undertakings of a sort private persons or businesses might engage in for profit." *Id.* Thus, an agency of the state government cloaked with governmental immunity can be sued for damages caused by its performance of a proprietary function. *Grayson County Bd. of Educ. v. Casey*, 157 S.W.3d 201, 202 (Ky.2005).

In *Kentucky Center for the Arts v. Berns*, 801 S.W.2d 327 (Ky.1990), our Supreme Court set forth a two-pronged test to determine whether an entity was entitled to immunity. The Court stated that the dispositive factors were whether the entity was under the "direction and control of the central State government" and whether it was "supported by monies which are disbursed by authority of the Commissioner of Finance out of the State treasury." *Id.* at 331. However, as later summarized in *Yanero*, "[t]he ultimate holding in *Berns* was that the Center for the Arts, though created by the state, was not entitled to immunity because it was not created to discharge any governmental function, and was not carrying out a function integral to state government." *Yanero*, 65 S.W.3d at 520 (internal citations and quotations omitted).

The *Berns* test remained seminal until the Supreme Court reexamined its holding in *Comair*, where it considered whether the Lexington–Fayette Urban County Airport Corporation had governmental immunity. Although not overruling *Berns*, the Court again attempted to bring consistency to an admittedly haphazard application of *Berns* and was prompted to "lay the cards on the table, so to speak, and explain the status of the various elements of *Berns*." *Comair*, 295 S.W.3d at 99.

As background, the Supreme Court reiterated that the state and counties enjoy sovereign immunity but cities, as municipal corporations, enjoy no immunity for "negligent acts committed outside the legislative and judicial realms." *Id.* at 94–95. The Supreme Court recognized other entities exist that are neither a city, state, nor county but are "in-between entities." *Id.* at 95. The proper analysis to determine whether immunity is available to an in-between entity has proven problematic.

It is frequently unclear whether these in-between entities are more similar to state or county agencies and entitled to immunity, or are more similar to municipal corporations and enjoy no immunity. *Id.* The Supreme Court pronounced a new two-part analysis, requiring that the origin of the entity be considered and then whether the entity carries out an integral state function to determine the entity's immunity status. *Id.* at 99. It noted that the function inquiry may be difficult to resolve. Quoting *Autry v. Western Kentucky University*, 219 S.W.3d 713, 717 (Ky. 2007), the Court reiterated that "[a]n analysis of what an agency actually does is required to determine its immunity status." *Comair*, 295 S.W.3d at 102.

Although *Comair* modified the *Berns* test, the proprietary/governmental function test remains viable in this jurisdiction. As stated in *Yanero*:

(It is) a reasonable compromise between allowing state agencies to perform their governmental functions without having to answer for their decisions in the context of ... litigation, and allowing private enterprises to pursue their legitimate business interests without unfair competition from government agencies

performing purely proprietary functions without the same costs and risks inherent in commercial enterprise.

*Yanero,* 65 S.W.3d at 521.

 A governmental function is one integral to state government. It is a function that addresses "state level governmental concerns that are common to all of the citizens of the state, even though those concerns may be addressed by smaller geographic entities (*e.g.,* by counties)." *Comair,* 295 S.W.3d at 99. In *Comair,* the Court recognized those functions declared governmental by our Supreme Court include police, public education, corrections, tax collection, and public highways. *Id.* Ultimately, the Court held the airport board was entitled to immunity because air transportation is an integral state function.

 The LAA is a non-profit corporation created for the purpose of overseeing the development, design, financing, construction operation and ownership of a multi-purpose sports and entertainment arena in Louisville. Similar entities have been denied governmental immunity.

In *Berns,* the Court held that the Kentucky Center for the Arts was created by statute but had no immunity and stressed the nature of its purpose and function.

> We recognize the difficulty of classifying entities for purposes of constitutionally protected sovereign immunity. But certainly not every business can be immunized simply because it is established by act of the General Assembly, and this corporation performs substantially the same functions as any private business engaged in the entertainment business.

*Berns,* 801 S.W.2d at 330–331. In *Kenton Co. Pub. Parks Corp. v. Modlin,* 901 S.W.2d 876, 879 (Ky.App.1995), the Court applied similar reasoning and held that although there may be some tangentially economic benefits to the government, the operation of a golf course was not an integral function of state government. To the extent that pre-*Comair* cases apply the governmental/proprietary function test, they remain binding precedent.

Like the Kentucky Center for the Arts, the Arena is an entertainment facility. The LAA attempts to distinguish *Berns* contending that its only function is to provide funding for the construction of the Arena and to hold title to the Arena. It points out that the Kentucky State Fair Board actually manages and operates the Arena.[1] Although it concedes that operation of the Arena "may be a proprietary function," it nevertheless claims immunity because the claims against it arising under the KMPC and out of that procurement, were governmental functions. We disagree.

The LAA asserts that its function is similar to that of the WKU Student Life Foundation (WKU–SLF) which was held to have immunity in *Autry.* In *Autry,* the Court held that if a public entity performs an integral governmental function it is entitled to immunity even though a private foundation conducts its day-to-day operations. *Autry,* 219 S.W.3d at 719. It reasoned:

> In reality SLF serves the University, and acts only on its behalf. SLF has no truly independent existence from WKU. To claim that WKU becomes an agent of SLF because of this arrangement is to elevate form over substance. SLF has no respondeat superior relationship with WKU, so as to make SLF vicariously liable for WKU's acts, because delegating dorm management to WKU is tantamount to WKU delegating to itself. The actual alignment is that WKU is a governmental agency fulfilling the public

1. We note that this statement may no longer be accurate.

purpose of higher education by providing residence halls to its students which it manages and controls. It uses SLF as an agent to own property for WKU's purposes. This is all that SLF does. Thus while SLF is an incorporated entity, it exists only to serve WKU, and derives its immunity status through WKU.

*Id.*

For purposes of determining its immunity status, we cannot agree that the LAA and the WKU–SLF are similar entities. First, the LAA's assertion it exists solely to provide funding and to hold title to the Arena is belied by its official Operations Management Agreement with the Fair Board which sets forth that the LAA has retained the Board to manage and operate the Arena on LAA's behalf. The agreement specifically states: "Manager acknowledges that the [LAA], as an independent nonprofit Kentucky corporation, and the developer and owner of the Arena, has the ultimate oversight for the Arena's operations[.]"

Moreover, the LAA's function is markedly dissimilar to the function performed by the WKU–SLF. Education is undeniably an integral governmental function entitling WKU to immunity and, therefore, the WKU–SLF to immunity. In contrast, the construction of an entertainment facility is not an integral governmental function.

## CONCLUSION

We hold that the Finance Cabinet is immune from monetary damages except for any damages arising from the breach of any written contract it had with RAM. Further, we hold that the LAA is not protected by governmental immunity. The denial of partial summary judgment to the Finance Cabinet is affirmed in part and reversed in part. The denial of partial summary judgment to the LAA is affirmed. The case is remanded to the Franklin Circuit Court for further proceedings.

ALL CONCUR.