RENDERED: APRIL 4, 2025; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-0681-MR

DOUGLAS T. JONES                                                                APPELLANT


v.
APPEAL FROM JEFFERSON CIRCUIT COURT
HONORABLE BRIAN EDWARDS, JUDGE
ACTION NO. 19-CI-003673


UNIVERSITY MEDICAL CENTER,
INC.                                                                                              APPELLEE


OPINION
AFFIRMING
** ** ** ** **

BEFORE: CETRULO, A. JONES, McNEILL, JUDGES.

CETRULO, JUDGE: Douglas T. Jones ("Jones") appeals the Jefferson Circuit

Court's summary dismissal of various civil claims he asserted against his former

employer, University Medical Center, Inc. ("UMC"). As set forth below, we

affirm the summary judgment.

# I. BACKGROUND

UMC is a non-profit hospital comprised of two entities: University of Louisville Hospital and the James Graham Brown Cancer Center. Jones is an information technology professional with a focus in the hospital industry. Jones began working for UMC on or about March 14, 2017 as an independent contractor with the primary purpose of facilitating the transition of UMC's IT department while it assumed management of KentuckyOne Health and integrated it with its broader strategic plan for its hospital systems. Based upon his positive work performance, UMC extended Jones a written offer of full-time, at-will employment as Chief Information Officer ("CIO") of Information Systems in its IT department with an annual salary of $375,000.

The written offer was dated October 27, 2017. As set forth in a November 8, 2017 email to Jones from UMC's Department of Human Resources, it was subsequently "updated to reflect that [Jones] would be eligible for incentive payments contingent upon UMC Board approval" and that Jones "would be eligible for the Board approved severance policy, should the need arise. That policy is attached." The "updated" written offer still bore a date of October 27, 2017. There is no dispute that UMC's original employment offer and its updated employment offer contained the following disclaimer which required Jones's acknowledgement: "I have not relied on any representations, expressed or implied

that are not set forth in this letter." There is also no dispute that Jones accepted UMC's updated offer, although neither party was able to locate the copy of the offer letter that he executed. In any event, the record reflects Jones began working for UMC as its at-will CIO of Information Systems no later than December 1, 2017.[1]

After Jones began his new position, UMC announced that it was preparing to implement an expansive organizational restructuring plan to combine UMC and its counterpart, University of Louisville Physicians ("ULP"), into an umbrella organization called UofL Health, Inc. As a result, the IT departments of each organization were being consolidated, and UofL Health would create a new position – Vice President/CIO of UofL Health. A hiring committee was later created to solicit internal and external candidates for the position. The committee was responsible for narrowing down the list of candidates and recommending a final candidate for selection. Jones became one of the candidates considered for the position. Another candidate was Sonney Sapra ("Sapra"), who was also an IT professional. The committee eventually determined that Jones and Sapra were the two strongest candidates for the position. Ultimately, the position was given to Sapra.

---

[1] In its answers to Jones's interrogatories, UMC indicated Jones's first day of at-will employment began October 30, 2017. Jones disagreed; during his deposition, he testified that he was an independent contractor and did not begin his at-will employment until December 1, 2017.

On January 25, 2019, UMC's human resources department notified Jones in writing that his existing position as UMC's at-will CIO would end effective February 11, 2019, and that it would be reassigning him to a different position within the IT senior leadership team as chief technical officer of UofL Health. The new role would come with a lower annual salary of $336,960. In the course of several ensuing emails he exchanged with the human resources department and Sapra, Jones then stated that he would not accept the new role; his non-acceptance of the proffered new role should not be taken as *his* termination of their employment relationship; and he regarded UMC's unequivocal termination of his existing role as UMC's termination of their employment relationship. He also pointed out that UMC's severance policy only disqualified employees from receiving severance if they voluntarily resigned or were separated from employment for performance-related reasons, and he argued that "reassignment" did not fit either of those scenarios. As such, Jones reasoned he was entitled to refuse the new position and, following the date that his existing position was scheduled to end, receive 52 weeks of severance pay from UMC.

UMC disagreed, informing Jones his refusal would be considered a resignation that would disqualify him from severance pay. Further, it indicated that its severance policy, as incorporated into the offer of employment he had accepted, never made Jones a binding promise of severance pay.

UMC later permitted Jones to continue working, at the same rate of pay, as its at-will CIO until March 1, 2019. Afterward, their employment relationship terminated; and, on June 14, 2019, Jones filed the instant suit against UMC in Jefferson Circuit Court, claiming UMC was liable to him for breach of a written contract, breach of an oral contract, fraud, promissory estoppel, violations of Kentucky's Wage and Hour Act ("KWHA"),[2] and age discrimination. Following discovery and a motion for summary judgment from UMC, the circuit court dismissed the balance of Jones's claims. This appeal followed. Additional, relevant facts will be discussed below in our analysis.

## II. STANDARD OF REVIEW

> The proper standard of review on appeal when a trial judge has granted a motion for summary judgment is whether the record, when examined in its entirety, shows there is "no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."

*Hammons v. Hammons*, 327 S.W.3d 444, 448 (Ky. 2010) (quoting Kentucky Rule of Civil Procedure ("CR") 56.03). In deciding issues on summary judgment, evidence must be viewed in the light most favorable to the non-moving party. *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476 (Ky. 1991). Because summary judgments involve no fact-finding, "we review the trial court's issuance of summary judgment de novo[.]" *Bd. of Regents of N. Kentucky Univ. v.*

---

[2] *See* Kentucky Revised Statute ("KRS") 337.010-.433.

-5-

*Weickgenannt*, 485 S.W.3d 299, 307 (Ky. 2016). Likewise, "[t]he construction and interpretation of a contract is a matter of law for the court. Our review of the trial court's decision is *de novo* without deference to the trial court's interpretation." *Spot-A-Pot, Inc. v. State Resources Corp.*, 278 S.W.3d 158, 161 (Ky. App. 2009) (citations omitted).

### III. ANALYSIS

#### A. Breach of Contract

Jones claimed UMC contracted with him as part of their employment relationship to pay him 52 weeks of severance pay if, upon termination of their contract, he was "eligible" for severance pay under the terms of UMC's severance policy. He asserted UMC breached their contract because it refused to pay him severance when, in his view, he was indeed eligible for severance under the terms of UMC's policy at the time his employment terminated. Jones based his reasoning upon the fact that neither his written offer of employment, nor UMC's severance policy, contemplated that UMC could "reassign" him (*i.e.*, end his existing position and require him to accept a new position) without effectively terminating their at-will employment relationship; and upon his understanding that UMC's severance policy explicitly promised that vice-president-level employees, such as himself, would receive 52 weeks of severance if UMC terminated them for reasons unrelated to performance issues.

The circuit court dismissed Jones's breach of contract claim because, among other reasons,[3] it determined Jones's employment agreement did not contain a binding promise of severance pay even if Jones might otherwise have been deemed "eligible" for it under the terms of UMC's severance policy. Upon review, we agree with the circuit court's disposition of this claim. The only mention of "severance" in the written offer of employment Jones received from UMC was the following:

> **Severance**
> Please see attached severance policy as approved by the University Medical Center Board on August 3, 2017. In the event severance benefits become necessary, the severance policy will be applied to your specific situation.

UMC's offer of employment to Jones further required him to acknowledge that by accepting it, he had "not relied on any representations, expressed or implied that are not set forth in this letter." Accordingly, Jones was on notice that any representations regarding "severance" he had received were entirely governed by UMC's "attached severance policy" referenced in the offer. That policy, in turn, provided in relevant part:

> **Purpose**:
> When business trends or other circumstances create a need to change the job assignments of certain employees or

---

[3] The circuit court also dismissed Jones's breach of contract claim after determining: (1) Jones had no contract with UMC, whatsoever; and that (2) Jones would in any event have been ineligible for severance under the terms of UMC's severance policy because he had "voluntarily resigned" from employment. It is unnecessary to discuss these points.

reduce the existing work force, University Medical Center will follow guidelines to ensure employees are treated with sensitivity and respect, in accordance with our core values and applicable federal and state laws. UMC *will offer* a severance package to regular full time and part time employees to help them through their transition from the organization.

**Coverage/Eligibility**:
*Severance benefits are not guaranteed. Severance is considered on a case-by-case basis. Generally, severance will be offered* to regular full time and part time employees based on years of service, position level and scheduled hours. If any employee's employment anniversary date falls within 30 calendar days of his or her separation date, the incomplete year will be rounded up.

To be eligible for severance, an employee must stay with the organization through the end of the announced separation date, not accept another regular full time or part time position within UMC, ULP, the University of Louisville, or any of its subsidiary corporations during the severance payment period.

An employee will not be eligible for severance if he or she voluntarily resigns or separates from the organization due to performance issues prior to the job separation date.

If an employee's position is eliminated prior to a previously announced separation date, the employee will be reassigned or paid severance beginning with the newly announced separation date.

Employees will be notified of job eliminations in accordance with applicable federal and state laws with the standard practice of providing notice as much in advance as possible.

*Management has the right to change severance terms, eligibility, pay amounts or cease or modify the severance policy at any time as business needs change.*

. . .

**Severance Pay**:
Severance pay *will be* calculated using base pay at the time of separation date and *offered* as followed:

. . .

4. Vice Presidents:  52 weeks.

(Emphasis added.)

A key element of any contractually binding promise is "mutual assent by the parties – a meeting of minds – and also an intentional manifestation of such assent." *Kincaid v. Johnson, True & Guarnieri, LLP*, 538 S.W.3d 901, 911 (Ky. App. 2017) (internal quotation marks and citations omitted).  Here, the above-italicized language of the severance policy underscores there was no assent from UMC to pay severance to Jones or anyone else.  First, it indicates the policy itself is not an offer, much less an offer Jones could accept by agreeing to be employed by UMC.  It merely indicates severance "will be offered" when UMC offers it.  Second, it indicates UMC does not promise to offer severance.  To that point, it explicitly states that "[s]everance benefits are not guaranteed.  Severance is considered on a case-by-case basis.  Generally, severance will be offered[.]"  Most saliently, the policy provides that UMC management "has the right to change

severance terms, eligibility, pay amounts or cease or modify the severance policy *at any time* as business needs change." (Emphasis added.) Thus, it leaves open that management may unilaterally cease any aspect of the policy without limitation, with or without notice.

Accordingly, UMC's severance policy may be summarized as follows: "I promise to render a future performance, if I want to when the time arrives." When such a "promise" is made, that is, a promise merely in form but in actuality not promising anything, "it cannot serve as consideration. Even if it were recognized by law, it would impose no obligation, since the promisor always has it within his power to keep his promise and yet escape performance of anything detrimental to himself or beneficial to the promissee." *RAM Eng'g & Constr., Inc. v. Univ. of Louisville*, 127 S.W.3d 579, 586 (Ky. 2003). Parenthetically, we recognize that "Courts [should] avoid constructions of contracts that would render promises illusory";[4] and that any construction should be consistent with the covenant of good faith implicit in every contract. However, good faith is necessarily limited by the parties' reasonable expectations. *RAM Eng'g*, 127 S.W.3d at 586. Neither this Court, nor a party's mere expectation, can create a contract where, plainly, no contract was intended. For that reason, the circuit court did not err in dismissing Jones's breach of contract claim against UMC.

---

[4] *Tackett v. M & G Polymers USA, LLC*, 811 F.3d 204 (6th Cir. 2016) (citation omitted).

## B. "Oral Contract," Promissory Estoppel, Fraud, and Alleged Violation of KWHA

Jones's additional claims against UMC for fraud, promissory estoppel, KWHA violations, and breach of an "oral contract" followed the same theme as his breach of contract claim set forth above: UMC refused to pay him severance when, in his view, he was eligible for severance under the terms of UMC's policy at the time his employment terminated. His fraud claim differed somewhat by alleging that, at the time UMC contracted to pay him severance, it had no present intention of fulfilling that contract.[5] His promissory estoppel claim alleged that even if consideration for UMC's promise to pay him severance had been lacking, his detrimental reliance upon that promise nevertheless rendered it enforceable. His KWHA claim alleged that because UMC had given him an enforceable promise of severance pay, UMC was liable for penalties consistent with KRS 337.385. His "oral contract" claim was simply an alternative to his written contract claim set forth above. During discovery, neither Jones nor UMC was able to locate an executed copy of their employment agreement. Jones argued that if

---

[5] *See, e.g.*, *PCR Contractors, Inc. v. Danial*, 354 S.W.3d 610, 614 (Ky. App. 2011) (internal quotation marks and citations omitted) ("Since a promise necessarily carries with it the implied assertion of an intention to perform it follows that a promise made without such intention is fraudulent and actionable in deceit . . . This is true whether or not the promise is enforceable as a contract.").

-11-

UMC contested the existence of any written agreement, an oral agreement nevertheless existed.

With all that said, the circuit court properly dismissed each of these claims because, as set forth above, UMC's severance policy could not form the basis of an enforceable *contract*; it did not *promise* Jones severance; and the KWHA applies to wages and compensation to which an employee is *entitled. See United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 470 (Ky. 1999) (explaining fraud and promissory estoppel both require reliance upon an underlying promise); *see also* KRS 337.385.

Jones also bases his fraud and promissory estoppel claims upon: (1) his deposition testimony that *before* he executed his employment agreement with UMC, he relied upon an oral promise from UMC's chief executive officer, Ken Marshall, to the effect that he would receive 52 weeks of severance pay and benefits if his position was terminated or if the company decided to "go with someone else in [his] position";[6] and (2) other evidence of record demonstrating that UMC, by and through its human resources department, attempted to convince

---

[6] Regarding Marshall's oral promise of severance, Jones's precise testimony was as follows: "I, I, I believe that I had a deal with Ken Marshall that I would have, if the position were terminated or, you know, they decided to go with someone else in my position that I would get 52 weeks and benefits. That was the agreement that we had. And yeah, that does, is different from what the, the severance policy that they sent me said, but I basically trusted my, my deal with Ken." Jones Depo. at 92.

-12-

him that he, not UMC, had terminated his employment with UMC when he declined UMC's offer of a lower-paying position.

However, to the extent Marshall's alleged oral promise differed from UMC's severance policy, Jones could not have relied upon it in the face of his acknowledgement, when he admittedly accepted UMC's offer, that he had "not relied on any representations, expressed or implied that are not set forth in this letter." *See, e.g.*, *Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc*., 113 S.W.3d 636, 642 (Ky. App. 2003) ("A party cannot reasonably rely on oral statements when it has acknowledged in writing several times that oral statements are not binding and may not be relied upon."); *see also Blackstone Mining Co. v. Travelers Ins. Co.*, 351 S.W.3d 193, 199-200 (Ky. 2010) (internal quotation marks and citations omitted) ("It is the settled law in Kentucky that one who signs a contract is presumed to know its contents, and that if he has an opportunity to read the contract which he signs he is bound by its provisions, unless he is misled as to the nature of the writing which he signs or his signature has been obtained by fraud.").

Also, to the extent that Jones takes issue with UMC's representations that he, and not UMC, terminated their employment relationship, Jones clearly did not *rely* upon those representations – this litigation is proof enough of that. Moreover, it is irrelevant who terminated their employment relationship because,

as set forth above, Jones was not promised severance regardless. For these reasons, the circuit court did not err in dismissing these additional claims.

### C. Age Discrimination Claim

KRS 344.040(1) states that it is unlawful for an employer to "fail or refuse to hire, or to discharge any individual, or otherwise to discriminate against an individual . . . because of the individual's . . . age." Our courts interpret the civil rights provisions of KRS Chapter 344 consistently with the applicable federal anti-discrimination laws. *See Williams v. Wal-Mart Stores, Inc.*, 184 S.W.3d 492, 495 (Ky. 2005) (citations omitted). In establishing a discrimination case, a plaintiff must either have direct evidence of discrimination or satisfy the burden-shifting test of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *Williams*, 184 S.W.3d at 495. This burden-shifting approach allows a victim of discrimination to attempt to establish a case through inferential and circumstantial proof in the absence of any direct evidence of discriminatory animus. *Id*. Our case law recognizes the difficulty of obtaining direct evidence of discrimination. *Id*. at 496.

Jones claimed UMC's decision not to promote him to the Vice President/CIO of UofL Health position was motivated by the fact that he was older

than the applicant that UMC ultimately chose.[7]  However, Jones offered no direct evidence of discriminatory animus.  In fact, he was hired by UMC at age 61 and was 62 when he was denied the promotion.

Therefore, he was required to establish a *prima facie* case by showing: (1) he was a member of a protected class; (2) he applied and was qualified for a promotion; (3) he was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions.  *Walker v. Commonwealth*, 503 S.W.3d 165, 174 (Ky. App. 2016) (citation omitted).  For age discrimination claims, the fourth element is modified to require promotion, not of a person outside the protected class, but of a significantly younger person.  *Williams*, 184 S.W.3d at 496.

Here, Jones established a *prima facie* case showing:  (1) at all times relevant, he was over 40 years of age; (2) he applied for and was qualified for the CIO position; (3) he was considered for and denied the position; and (4) the

---

[7] Jones had also claimed that he stopped working for UMC because the alleged discrimination had created a hostile workplace environment.  On appeal, Jones makes no argument the circuit court erred insofar as it dismissed the "hostile workplace" aspect of his age discrimination claim; therefore, he has abandoned that aspect of his claim.  *See, e.g.*, *Osborne v. Payne*, 31 S.W.3d 911, 916 (Ky. 2000) ("Any part of a judgment appealed from that is not briefed is affirmed as being confessed.").

individual ultimately hired for the position, Sapra, was at least 15 years younger than him and thus "significantly younger."[8]

Pursuant to the *McDonnell Douglas* burden shift, if a plaintiff establishes a *prima facie* case, the employer must then rebut the presumption of discrimination by proffering a legitimate, non-discriminatory reason for its decision. *Williams v. Brown-Forman Corp.*, 640 S.W.3d 73, 81 (Ky. App. 2021) (citations omitted). Here, UMC rebutted the presumption by pointing to deposition testimony of Smith and Elliott, two members of the UMC hiring committee that had been tasked with selecting the best candidate for the CIO position. This testimony addressed the hiring committee's function, its criteria for assessing candidates, and why the hiring committee had selected Sapra over Jones. Smith's testimony of record[9] addressed the first two of those three points:

> SMITH: [The UMC hiring committee] was run as a search committee similar to what we would run searching for a department chair or the like. The understanding was that we were to evaluate candidates and provide a slate of candidates that had been interviewed to the upper management for hiring.
>
> Q: And when you're referring to upper management, who were the upper management at that point?

---

[8] The record does not disclose Sapra's age at that time but, again, the parties do not dispute Sapra was at least 15 years younger. Our Supreme Court has indicated that an age difference by a margin of at least eight years qualifies as "significantly younger" for purposes of an age discrimination claim. *See Williams*, 184 S.W.3d at 496-97.

[9] The appellate record does not contain complete depositions. Selected pages of various depositions were attached to the parties' respective summary judgment motions and responses.

SMITH:  I believe at the time that would have been Dr. Greg Postel, who was serving as executive vice president for health affairs.

. . . .

Q:  What do you recall about the interviews themselves?

SMITH: The beginning process itself was fairly straightforward.  It was as we worked our way through the interviews, I think, pretty apparent that [] Sapra and Jones were the two strongest candidates that we were interviewing.  They were the most experienced, most personable of the three.

Q:  Did you discuss their relative experience in prior CIO positions?

SMITH:  During the interview process, yes.

Q:  What else was discussed other than prior experience?

SMITH:  I believe the biggest concern the committee had was, you know, the transition that we were going to be making and having to take over and work with the new KentuckyOne facilities because we were still looking at purchasing those at that time.  So it was a large project, and we knew that it would be an important project to be – having someone who had experience with transitions.

Elliott's testimony addressed not only the hiring committee's function and criteria, but also why the hiring committee had selected Sapra over Jones:

Q:  Do you recall any specifics of any conversations with other members of the selection committee about the rationale – about their individual rationale for voting for Mr. Sapra rather than Mr. Jones?

ELLIOTT:  I have some recollections of that.

Q:  What is your recollection?

ELLIOTT: What I recall was there were two entities: University of Louisville Physicians and University of Louisville Hospital.  Each had a separate and distinct IT team.  [Jones] was over the hospital IT team.  Henk DeWerdt ["Henk"]was over the physicians group practice IT team.

. . . .

The two IT teams were having difficulty working well together.   [Jones] and Henk were having difficulty working together, and it became clear to some that their lack of ability to be able to work together and team build was going to be detrimental to the future of the U of L Health consolidated IT team because those two teams were going to have to come together as one, but the two leaders were having conflicts.  I don't recall the nature of the conflicts, but they were having conflicts.  It was a big problem.

. . . .

And so that's kind of the background and context, but it – part of the committee felt like [Sapra] is going to be better at team building than [Jones].  So some of the members felt like [Sapra] was going to be the better choice for bringing these two teams together to get them to work together and to team build and to get them aligned to get them on the same page so that when we installed Epic, they are working real well together.

In short, the committee's function was to make a hiring recommendation to upper management.  Smith and Elliott agreed Jones and Sapra were both qualified for the position.  However, both indicated that an important

-18-

criteria in the hiring process was team building. Elliott, for his part, represented that he and other unidentified members of the committee had found Jones less appealing because they perceived Jones had been having conflicts with the other IT team leader in the organization. We agree with the trial court's finding that UMC provided evidence of a legitimate, non-discriminatory reason for hiring Sapra. *See Kentucky Ctr. for the Arts v. Handley*, 827 S.W.2d 697, 700 (Ky. App. 1991).

At this point, the burden once again shifted to Jones, this time to prove that UMC's stated reasons for not offering him the job were a pretext for age discrimination. Jones then bore the burden of showing, by a preponderance of evidence, (1) that the proffered reason was false; (2) the proffered reason did not actually motivate the decision; and (3) the reason given was insufficient to motivate the decision. *See Williams*, 184 S.W.3d at 497 (citation omitted). However, we note that Jones's testimony on this was based solely on his own subjective belief that he was the better candidate.

In his deposition, Jones was asked when he first came to believe that age affected the decision to hire Sapra instead of him since he had been hired just a year earlier at age 61. He responded:

> A. Well, I mean there's such a huge disparity in qualifications. That seemed to be the only, rational . . . because of the huge differences in our ages, I couldn't think of another rational reason for that decision.

-19-

It was incumbent upon Jones to submit "proof of cold hard facts creating an inference showing age discrimination was a determining factor in the discharge." *Conley v. Mountain Comprehensive Care Ctr., Inc.*, 533 S.W.3d 705, 708 (Ky. App. 2017) (citing *Harker v. Federal Land Bank of Louisville*, 679 S.W.2d 226, 229 (Ky. 1984)). The circuit court found that Jones failed to provide such cold hard facts that his age was the determining factor in UMC choosing Sapra over Jones. Instead, Jones simply presented his subjective beliefs and theories that he was the better candidate.

On appeal, he argues that it is clear from the resumes alone he had more experience. He also claims he established pretext with his testimony that another committee member told him he was favored by the committee but that upper management made a decision that was at odds with the committee. We have reviewed the entire record before us and do not find within this testimony any evidence or facts that indicate age was the basis for the decision. Even where an employee establishes a *prima facie* case, an employer can still be "entitled to judgment as a matter of law if the record **conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact** as to whether the employer's reason was untrue[.]" *Williams*, 184 S.W.3d at 499 (emphasis added) (internal quotation marks and citation omitted).

-20-

As the circuit court found, Jones did not point to any evidence to demonstrate his age was a motivating factor in the decision to hire Sapra. He only pointed to his personal belief that age could be the only "rational" reason he was not being offered the promotion. UMC provided another reason. It is important to note that, under the summary judgment standard, "[a] party's subjective beliefs about the nature of the evidence [are] not the sort of affirmative proof required to avoid summary judgment." *Haugh v. City of Louisville*, 242 S.W.3d 683, 686 (Ky. App. 2007) (citing *Humana of Kentucky, Inc. v. Seitz*, 796 S.W.2d 1, 3 (Ky. 1990)). After a defendant has provided a legitimate, non-discriminatory reason for the termination, the *McDonnell Douglas* framework disappears. At this point, the plaintiff must persuade the trier-of-fact, by a preponderance of the evidence, that the defendant unlawfully discriminated against him. *Norton Healthcare, Inc. v. Disselkamp*, 600 S.W.3d 696, 719 (Ky. 2020).

"The appropriate inquiry was not only whether a prima facie case had been established, but was instead whether there was sufficient evidence to permit a rational trier of fact to conclude that [UMC] had unlawfully discriminated against [Jones] because of his age." We conclude that there was not.

### IV. CONCLUSION

For the reasons expressed above, we AFFIRM the Jefferson Circuit Court.

McNEILL, JUDGE, CONCURS.

JONES, A., JUDGE, CONCURS IN PART AND DISSENTS IN PART AND FILES SEPARATE OPINION.

JONES, A., JUDGE, CONCURRING IN PART AND DISSENTING IN PART: While I concur with respect to most of the claims, I most respectfully dissent regarding the trial court's disposition of Jones's KRS 344.040(1) age discrimination claim.

As the majority correctly observed, because Jones did not present any direct evidence of discriminatory animus, he was required to establish a prima facie case through inferential and circumstantial proof. He did so. Thereafter, the burden was placed on UMC to proffer a legitimate, nondiscriminatory reason for its decision. To meet its burden, UMC relied on testimony from Jason Smith and John Elliott to support that the committee selected Sapra over Jones because it believed Sapra possessed superior team building skills.

At this point, the burden shifted back to Jones to show that UMC's proffered reason was merely pretextual. The plaintiff may do so by showing "(1) the proffered reasons are false; (2) the proffered reasons did not actually motivate the decision; and (3) the plaintiff could show that the reasons given were insufficient to motivate the decision." *Williams v. Wal-Mart Stores, Inc.*, 184 S.W.3d 492, 497 (Ky. 2005) (citation omitted). Here, Jones relied on his deposition testimony that, after the Committee meeting, he spoke to Ken Marshall,

UMC's CEO and a member of the committee, who told him that the committee had decided that he was the superior candidate.[10] If true, Mr. Marshall's statement would prove UMC's nondiscriminatory explanation to be false. "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Williams*, 184 S.W.3d at 499.

In cases such as this, where there is evidence for both sides, the jury serves an invaluable and unique function. The jurors hear and see the witnesses testify in person. Their role is to assess the strength of the evidence and the credibility of the witnesses. To be sure, at least on paper, Jones's evidence is not the strongest. However, it cannot be said that Elliott's testimony, standing alone in the face of Jones's testimony, qualified as "abundant and uncontroverted independent evidence that no discrimination had occurred[,]" or "conclusively" demonstrated what the hiring committee's recommendation – if any – actually was. *Id.* (citation omitted). Absent more, our standard for summary judgment must prevail: The evidence taken in the light most favorable to the nonmoving party –

---

[10] Pursuant to Kentucky Rule of Evidence ("KRE") 801A(b)(4) "a statement is not excluded by the hearsay rule, even though the declarant is available as a witness, if the statement is offered against a party and is . . . [a] statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship[.]" *Ten Broeck Dupont, Inc. v. Brooks*, 283 S.W.3d 705, 723 (Ky. 2009) (holding statements made by hospital's agents within the scope of their employment were admissible under hearsay exception for admissions of parties).

Jones – demonstrates a triable issue regarding Jones's claim of failure-to-promote age discrimination. Accordingly, I dissent with respect to the age discrimination claim. I would reverse the circuit court and remand for further proceedings as to Jones's age discrimination claim.

BRIEFS FOR APPELLANT:

Gary R. Adams
A. Pete Lay
Louisville, Kentucky

BRIEF FOR APPELLEE:

Brent R. Baughman
Aaron W. Marcus
Chelsea Granville Reed
Louisville, Kentucky